(Nos. 88407, 88410 cons.—

TRAVELERS INSURANCE COMPANY *et al.*
(Gibralter Casualty Company, Appellee and Cross-
Appellant) v. ELJER MANUFACTURING, INC., *et
al.*, Appellants and Cross-Appellees.

*Opinion filed September 20, 2001.*

Luke DeGrand, of Clark & DeGrand, of Chicago, and Jonathan Hayden, of Heller, Ehrman, White & McAuliffe, of San Francisco, California, for appellant and cross-appellee Household International, Inc.

Michael D. Freeborn and Michael T. Novak, of Freeborn & Peters, of Chicago, and R. Nicholas Gimbel, of Klett, Rooney, Lieber & Schorling, of Philadelphia, Pennsylvania (Jan Fink Call, Kevin J. Kotch, Kenneth J. Grunfeld and Charles B. Blakinger, of Hoyle, Morris & Kerr L.L.P., of Philadelphia, Pennsylvania, of counsel),

for appellants and cross-appellees United States Brass Corporation *et al.*

William M. Cohn, Michael J. Baughman and Brian C. Coffey, of Cohn & Baughman, of Chicago, and Mark D. Plevin, Amy J. Mauser, Steven P. Rice, Paul N. Alp and Sheetal B. Shah, of Crowell & Moring L.L.P., of Washington, D.C., for appellees and cross-appellants Century Indemnity Co. and International Insurance Co.

Mitchell S. Goldgehn and James A. Smith, of Aronberg, Goldgehn, Davis & Garmisa, of Chicago, for appellees and cross-appellants Allstate Insurance Co. *et al.*

Terrence E. Kiwala, of Rooks, Pitts & Poust, of Chicago, and William J. Bowman and Patrick F. Hofer, of Hogan & Hartson L.L.P., of Washington, D.C., for appellees and cross-appellants Hartford Accident & Indemnity Co. and First State Insurance Co.

Jay V. Krafsur, of the Krafsur Law Group, of Chicago, for appellee and cross-appellant National Surety Corporation.

Robert C. Johnson and Alan M. Posner, of Sonnenschein, Nath & Rosenthal, of Chicago, for appellees and cross-appellants Travelers Casualty & Surety Co. and Travelers Insurance Group Inc.

Hallie Miller Fahey and Michael M. Marick, of Meckler, Bulger & Tilson, of Chicago, for appellee and cross-appellant Zurich International, Ltd.

Margaret H. Warner and Gregory A. Krauss, of McDermott, Will & Emery, of Washington, D.C., and Michael Resis and Victor J. Piekarski, of O'Hagan, Smith & Amundsen, L.L.C., of Chicago, for appellee and cross-appellant Continental Insurance Co.

Matthew J. Fink, of Bollinger, Ruberry & Garvey, of Chicago, for appellee and cross-appellant International Insurance Co.

Sandra Young and Thomas B. Underwood, of Purcell & Wardrope, of Chicago, for appellees and cross-appellants National Union Fire Insurance Co. of Pittsburgh and Granite State Insurance Co.

Creed T. Tucker and Alan S. Zelkowitz, of Landau, Omahana, Tucker, Progar & Siebenhaar, L.L.C., of Chicago, for appellee and cross-appellant Federal Insurance Co.

Thomas W. Brunner, John C. Yang, Leslie A. Platt and N. Christopher Hardee, of Wiley, Rein & Fielding, of Washington, D.C., for *amicus curiae* The Insurers' Year 2000 Roundtable.

JUSTICE McMORROW delivered the opinion of the court:

We are asked in this consolidated appeal to determine when indemnity coverage for "property damage" under excess comprehensive general liability insurance policies, issued between 1979 and 1990 by various insurance companies[1] (the insurers) to Eljer Manufacturing, Inc., Eljer

---

[1]The insurance companies which are party to this appeal consist of two groups: those which issued policies between 1979 and 1981 (pre-1982 policies) and those which issued policies between 1982 and 1990 (post-1981 policies). The pre-1982 policies were issued by Aetna Casualty and Surety Company, Allstate Insurance Company, Employers Mutual Casualty Company, Gibraltar Casualty Company, Lexington Insurance Company, National Union Fire Insurance Company, North River Insurance Company and Old Republic Insurance Company. The post-1981 policies were issued by Travelers Casualty and Surety Company, Traveler's Insurance Group, Continental Insurance Company, Royal Insurance Company, Zurich International Limited, National Surety Corporation, Granite State Insurance Company, National Union Fire Insurance Company, Federal Insurance Company, International Insurance Company, Hartford Accident and Indemnity Company, First State Insurance Company, and Century Indemnity Company. For purposes of this appeal, we collectively refer to all insurance company parties as "the insurers."

Industries, Inc., United States Brass Corporation and Household International, Inc. (the policyholders), is triggered. The insurers filed four declaratory judgment actions in the circuit court of Cook County, seeking a declaration with respect to the insurers' obligations to indemnify the policyholders in thousands of underlying product liability claims filed by individuals alleging property damage arising out of the failure of the "Qest Qick/Sert II" (Qest) residential plumbing system. The Qest system was manufactured and sold by the policyholders, and was installed in buildings throughout the country during the policy periods. The circuit court of Cook County consolidated the insurers' declaratory judgment actions, and the parties thereafter filed cross-motions for partial summary judgment on the trigger-of-coverage issue. The circuit court granted summary judgment in favor of the insurers, and denied the cross-motion for summary judgment brought by the policyholders. The circuit court ruled, as a matter of law, that the insurers' duty to indemnify the policyholders for underlying "property damage" claims is triggered only when an actual leak in a Qest plumbing system occurs during the policy period. The circuit court explicitly rejected the argument advanced by the policyholders that "property damage" covered under the insurers' policies occurred during the policy period in which the Qest plumbing system was installed into a residence.

The appellate court reversed the circuit court's grant of summary judgment as to those insurance policies governed by New York law and issued prior to 1982, holding that the policy language did not require a leak to trigger coverage. With respect to those policies governed by Illinois law and issued after 1981, the appellate court determined that the circuit court correctly denied the policyholders' motion for summary judgment. However, the appellate court also found that the circuit court erred in granting summary judgment to the insurers with respect to the post-1981 policies. The appellate court

concluded that the circuit court incorrectly held that "property damage" occurs, and coverage is therefore triggered, only at the time that a Qest system develops a leak. 307 Ill. App. 3d 872. We granted the policyholders' petitions for leave to appeal (177 Ill. 2d R. 315(a)), and consolidated these cases. For the reasons that follow, we affirm in part, reverse in part, and remand this cause to the circuit court for further proceedings.

## BACKGROUND

Certain relevant facts giving rise to these consolidated actions are not in dispute. Between 1979 and 1990, United States Brass Corporation (U.S. Brass) manufactured and sold the components comprising a polybutylene plumbing system known as "Qest Qick/Sert II" (Qest). This plastic, hot/cold pressure residential plumbing system was sold to plumbing contractors who installed the system at construction sites, usually behind walls, or between floors and ceilings. Qest systems were installed in site-built homes, apartment buildings, and condominiums across the country until December 31, 1986. At that time, U.S. Brass ceased warranting the Qest system for use in site-built structures. However, U.S. Brass continued to manufacture and market the Qest system for mobile homes and prefabricated housing through 1990. It is estimated that between 500,000 and 750,000 housing units in the United States contain the Qest plumbing system. U.S. Brass is currently a wholly owned subsidiary of Eljer Manufacturing, Inc., which, in turn, is wholly owned by Eljer Industries, Inc. For a period of time relevant to this matter, U.S. Brass was a wholly owned subsidiary of Household International, Inc. As stated, these four corporate entities are the policyholders in the matter at bar.

According to an affidavit filed in the circuit court by Catherine E. Bracken, general counsel for U.S. Brass and senior counsel of Eljer Industries, Inc., as a result of certain alleged defects in the Qest plumbing system, product liability claims with respect to the Qest systems were first filed against U.S. Brass and its parent corpora-

tions in the early 1980s. These claims generally alleged that defects in the Qest system caused the system to leak, and sought recovery based upon theories of negligence, breach of warranty, strict tort liability, and, in some cases, fraud or misrepresentation. According to Bracken's affidavit, by the end of 1993, approximately 61,300 claims had been filed against U.S. Brass and its parent companies as a result of Qest system failures. Based upon the number of claims at that time, U.S. Brass estimated that approximately 4.6% of the Qest systems installed between 1979 and 1990 had experienced failures. Bracken averred that U.S. Brass and Eljer had made no subsequent estimates with respect to the projected failure rate of the Qest systems.

In her affidavit, Bracken further stated that several jury verdicts, in various jurisdictions across the county, have been entered against U.S. Brass and its parent corporations as a result of the Qest claims, "and thousands of other claims have been settled."[2] Kurt Nelson, outside counsel for U.S. Brass, stated in an affidavit submitted to the circuit court that almost all litigated claims involved residences which had experienced leaks in the Qest system. Nelson averred that these claims generally sought recovery for water damage to the housing structure, fixtures and personal property. In addition, damages were sought for expenses incurred in removing the Qest system from behind walls, floors and ceilings, and for diminution in the value of the building resulting from the presence of allegedly defective plumbing. According to Nelson, a minority of claims involved buildings that had not yet experienced leaks, but in which the homeowners, as a preventive measure, had removed the Qest systems. These claims sought recovery for the cost of replacing the Qest system as well as the diminution in value of the residences.

[2]The record reveals that, through the end of 1993, 202 lawsuits (representing approximately 26,700 Qest residential installations) were settled, and that U.S. Brass had incurred approximately $64 million in liabilities as a result of these claims.

During the early 1990s, the four insurance coverage suits at issue in the appeal at bar were filed in the circuit court of Cook County. In May 1994, while these declaratory judgment actions were pending, U.S. Brass filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Texas.[3] Upon U.S. Brass' bankruptcy filing, proceedings in these Cook County coverage actions were automatically stayed. In June 1994, U.S. Brass filed in the United States Bankruptcy Court for the Northern District of Illinois a motion to transfer venue of these four coverage suits to the federal Bankruptcy Court for the Eastern District of Texas. However, the federal bankruptcy court for the Northern District of Illinois abstained from exercising jurisdiction and ordered these matters remanded to the circuit court of Cook County. The order of the bankruptcy court was affirmed by the United States District Court for the Northern District of Illinois (see *U.S. Brass Corp. v. California Insurance Co.*, 198 B.R. 940 (N.D. Ill. 1996)) and the United States Court of Appeals for the Seventh Circuit (see *In re United States Brass Corp.*, 110 F.3d 1261 (7th Cir. 1997)). On December 31, 1997, the bankruptcy stay was lifted by the United States Bankruptcy Court for the Eastern District of Texas. Thereafter, these declaratory judgment suits went forward in the circuit court of Cook County.

The circuit court consolidated the four suits into a single action seeking a declaration with respect to the triggering event for the insurers' duty to indemnify the policyholders for the underlying Qest liability claims. Throughout the period during which the policyholders manufactured and marketed the Qest system, the policyholders maintained multiple layers of comprehensive general liability (CGL) insurance. The excess CGL policies at issue in this appeal are "form following" poli-

[3]According to documents filed by U.S. Brass and the Eljer companies in the federal bankruptcy actions, 108 lawsuits covering approximately 30,000 claims involving Qest Systems remained pending as of March 31, 1994.

cies which incorporate the terms and conditions of the policy in the layer of coverage below them, and which are only to be implicated once the underlying layers of coverage are exhausted. The relevant language contained in all of the excess CGL policies at issue in the matter at bar is identical, to the extent that all policies provide indemnity coverage for an "occurrence" resulting in third-party "property damage" which takes place during the respective policy period.

However, the policies differ with respect to the definition of "property damage," depending upon the years in which the policies were issued. The excess CGL indemnity policies in effect from 1979 through 1981 (pre-1982 policies) were negotiated and issued in New York to a New York predecessor corporation of Household International, Inc., the former parent corporation of U.S. Brass. These policies followed form to a first-layer umbrella policy issued by Highlands Insurance Company, and define "property damage" as an "injury to tangible property." The parties agree that New York law controls the interpretation of the pre-1982 policies.

The parties further agree that Illinois law controls the interpretation of the excess CGL indemnity policies issued after 1981 through 1990 (post-1981 policies). These policies were negotiated and issued in Illinois upon the move of U.S. Brass' parent corporation to this state, and followed form to a first-layer umbrella policy issued by Travelers Indemnity Company. The post-1981 policies define "property damage" as "physical injury to or destruction of tangible property."[4]

The parties at bar dispute when the insurers' duty to indemnify the policyholders for underlying "property damage" claims is triggered. The insurers filed with the circuit court a motion for partial summary judgment on

---

[4]According to the affidavit of Catherine Bracken, after 1986, insurance policies which covered the liability of U.S. Brass and the Eljer companies contained a variety of exclusionary clauses with respect to coverage for Qest claims. These exclusionary clauses are not at issue in this appeal, and we express no opinion on them.

the trigger of coverage issue, arguing that under the language of the policies, indemnity coverage for Qest claims is triggered no earlier than the time at which a Qest system first leaks, and not at the time that the system was installed. According to the insurers, it is only those policies in effect at the time of the occurrence of a leak which give rise to their indemnification obligation. The policyholders filed a cross-motion for summary judgment, seeking a declaration that the very installation of the allegedly defective Qest system into a residential structure causes "property damage" within the meaning of the policies and, therefore, that indemnity coverage under the policies is triggered at the time of installation. In the alternative, the policyholders requested that the circuit court allow discovery on the issues raised by the parties' summary judgment motions.

On May 27, 1998, the circuit court issued a memorandum of opinion in which the court found that, as a matter of law, indemnity coverage under the policies is triggered upon the leak of a Qest system, because it is only at that time that a third-party experiences "property damage" within the meaning of the policy language. The circuit court further found that, as a matter of law, the installation of a Qest system did not constitute "property damage" within the meaning of the policies.

In addressing the coverage trigger issue with respect to the policies issued prior to 1982, the circuit court reviewed the New York decisions submitted by the parties, and concluded that "the reasoning of the New York courts clearly illustrates that the plain language of the policies calls for coverage upon the occurrence of an injury-in-fact." Therefore, the circuit court held that, under New York law, "the installation of the plumbing system is not the triggering event. The 'occurrence' is the leak as that is when the 'effects of exposure' actually result in damage to property."

With respect to the trigger of coverage under the post-1981 policies, the circuit court relied upon our appellate court's decisions in *Diamond State Insurance Co.*

*v. Chester-Jensen Co.*, 243 Ill. App. 3d 471 (1993), and *Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.*, 218 Ill. App. 3d 956 (1991). Applying the reasoning of these decisions, the circuit court held that the policy coverage is triggered at the moment there is a leak in a Qest system, and not upon installation of the system. In reaching this conclusion, the circuit court observed that CGL policies are "intended to protect the insured from liability for injury or damage to the person or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses." Quoting from the *Diamond State* decision, the circuit court concluded that "[f]inding coverage for the cost of replacing or repairing defective work would 'transform the policy into something akin to a performance bond.' "

On July 7, 1998, the circuit court entered an agreed order granting the insurers' motion for summary judgment on the trigger of coverage issue, denying the policyholders' cross-motion for summary judgment on the trigger of coverage issue, and directing entry of a declaratory judgment that "it is the leak of the Qest/Qick Sert II polybutylene plumbing system, and not the installation of the system, which will trigger coverage for property damage claims under the policies issued by the insurers in these cases."

On appeal, the appellate court affirmed in part and reversed in part the judgment of the circuit court. 307 Ill. App. 3d 872. The appellate court held that the circuit court erred in granting summary judgment to the insurers with respect to the coverage trigger issue under the pre-1982 policies. The appellate court observed that in *Sturges Manufacturing Co. v. Utica Mutual Insurance Co.*, 37 N.Y.2d 69, 332 N.E.2d 319, 371 N.Y.S.2d 444 (1975), New York's highest court determined that the very installation of a defective component, other than a contaminant, could constitute "property damage" under policy language identical to that at issue in the cause at

bar. The appellate court observed that, under *Sturges*, coverage for "property damage" under the pre-1982 policies could be triggered at the time of installation if it caused diminution in value to the residences in which the Qest system was installed in an amount in excess of the value of the Qest system itself. The appellate court further found, however, that since the record contained no evidence of whether, in fact, any diminution in value resulting from the presence of the Qest system in a residence exceeded the value of the Qest system itself, the circuit court correctly denied the policyholder's motion for summary judgment, in which the policyholders had argued that, as a matter of law, diminution in value within the meaning of the *Sturges* decision occurred upon the very installation of the Qest system. Finally, the appellate court held that, to the extent that the policyholders were requesting a declaration of the insurers' duty to indemnify, the relief they seek is "premature pending resolution of the underlying claims." 307 Ill. App. 3d at 887. Accordingly, the appellate court remanded this issue to the circuit court for further proceedings.

With respect to the excess CGL policies issued to the policyholders after 1981, the appellate court, applying Illinois law, rejected the argument advanced by the policyholders that indemnity coverage for "property damage" within the meaning of the policies was triggered upon the very installation of a Qest system into a structure. The appellate court therefore affirmed the circuit court's denial of the policyholders' motion for summary judgment on this issue. The appellate court concluded, however, that although coverage under the post-1981 policies is not triggered by the mere installation of a Qest system, it "can be triggered prior to the development of a leak if the replacement of the system necessitates actual physical damage to tangible property other than the Qest System itself." 307 Ill. App. 3d at 886. Thus, the appellate court determined that the circuit court erred in concluding that coverage under the post-1981 policies is only triggered upon a Qest system developing a leak, and also erred in granting summary

judgment in favor of the insurers on this issue. Accordingly, the appellate court reversed the circuit court's grant of summary judgment to the insurers with respect to the post-1981 policies, and remanded the cause to the circuit court for further proceedings.

We allowed the policyholders' petitions for leave to appeal (177 Ill. 2d R. 315(a)), and consolidated the actions. We also allowed an *amicus curiae* brief to be filed by the Insurer's Year 2000 Roundtable in support of the insurers' position. In addition, the insurers were granted leave to file briefs as cross-appellants. On December 1, 2000, this court issued an opinion affirming in part and reversing in part the judgment of the appellate court. U.S. Brass, Eljer Manufacturing, Inc., and Eljer Industries, Inc., subsequently filed a petition for rehearing, which we allowed. 155 Ill. 2d R. 367.

## ANALYSIS

The sole issue presented in this appeal concerns the construction of the "property damage" provision contained within the excess CGL indemnity policies issued to the policyholders by the insurers. In general, the insurers argue that "property damage" does not occur until a particular claimant's Qest system fails and leaks, causing water damage to the claimant's property. According to the insurers, this is the earliest possible moment that the duty to indemnify the policyholders is triggered. Conversely, the policyholders advance the argument that "property damage" within the meaning of the policies takes place at the time of the installation of the allegedly defective Qest system. Therefore, the policyholders contend, the insurers' duty to indemnify the policyholders is triggered at the time of installation, under the policy in effect during that period, even if no leak takes place until after the policy period has concluded.

Initially, we note that this appeal was taken from the circuit court's orders granting summary judgment in

favor of the insurers on the trigger of coverage issue and denying the policyholders' cross-motion for summary judgment. In appeals from summary judgment rulings, our review is *de novo*. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390 (1993); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). Although the use of summary judgment aids in the expeditious disposition of a lawsuit, "[s]ummary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine*, 154 Ill. 2d at 102. A motion for summary judgment is properly granted, therefore, only when the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1998). In considering a summary judgment motion, the court has a duty to construe the evidence strictly against the movant and liberally in favor of the nonmoving party. *Outboard Marine*, 154 Ill. 2d at 131-32.

The construction of the provisions of an insurance policy is also a question of law, subject to *de novo* review. *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479-80 (1997); *Outboard Marine*, 154 Ill. 2d at 108. In construing the language of the policy, the court's primary objective is to ascertain and give effect to the intent of the parties to the contract. *Koloms*, 177 Ill. 2d at 479; *Outboard Marine*, 154 Ill. 2d at 108. In order to ascertain the meaning of the policy's language and the parties' intent, the court must construe the policy as a whole and "take into account the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract." *Koloms*, 177 Ill. 2d at 479; see also *Outboard Marine*, 154 Ill. 2d at 108. If the words of a policy are clear and unambiguous, "a court must afford them

their *plain, ordinary, and popular meaning.*" (Emphasis in original.) *Outboard Marine*, 154 Ill. 2d at 108. Conversely, if the language of the policy is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer who drafted the policy and in favor of the insured. *Koloms*, 177 Ill. 2d at 479; *Outboard Marine*, 154 Ill. 2d at 108-09. However, this court "will not strain to find ambiguity in an insurance policy where none exists." *McKinney v. Allstate Insurance Co.*, 188 Ill. 2d 493, 497 (1999); see also *Crum & Forster*, 156 Ill. 2d at 391.

The issue of construction presented by this appeal arises in the context of the excess insurers' duty to indemnify the policyholders. "The duty to indemnify arises only when the insured becomes legally obligated to pay damages in the underlying action that gives rise to a claim under the policy." *Zurich Insurance Co. v. Raymark Industries, Inc.*, 118 Ill. 2d 23, 52 (1987); see also *Outboard Marine*, 154 Ill. 2d at 128. "[T]he question of whether the insurer has a duty to indemnify the insured for a particular liability is only ripe for consideration if the insured has already incurred liability in the underlying claim against it." *Outboard Marine*, 154 Ill. 2d at 127; see also *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64, 73 (1991); *Zurich*, 118 Ill. 2d at 52. Once the insured has incurred liability as a result of the underlying claim, an insurer's duty to indemnify arises only if "the insured's activity and the resulting loss or damage *actually* fall within the CGL policy's coverage." (Emphasis in original.) *Outboard Marine*, 154 Ill. 2d at 128.

In the case at bar, the record establishes that the policyholders have already incurred liability with respect to the underlying Qest claims. In order to assess if and when the insurers' duty to indemnify the policyholders is triggered, we must determine whether the policyholders'

activities, with respect to coverage for "property damage," actually fall within the policies' coverage during the policy periods. The parties agree that there must be an "occurrence" resulting in "property damage" during the policy period before coverage under the policies is triggered. They disagree, however, as to when the covered "property damage" occurs. The correct application of the coverage trigger necessarily depends upon the meaning of "property damage" as that phrase is used in the policies. Because the policies differ with respect to the meaning of "property damage" based upon when the policies were issued, we divide our analysis into two parts: we first consider the policies issued for periods prior to 1982, and thereafter address the policies issued for periods subsequent to 1981.

## I. Pre-1982 Policies

The excess CGL indemnity policies issued by the insurers to the policyholders between 1979 and 1981 provide that the insurers have a duty to indemnify the policyholders for "damages because of *** property damage *** caused by each occurrence happening anywhere in the world." All pre-1982 policies contain the identical definitions for "occurrence" and "property damage." The policies define "occurrence" as "an accident, including injurious exposure to conditions, which results, during the policy period in *** property damage." The policies define "property damage" as "injury to or destruction of tangible property."

As stated, there is no dispute between the parties that New York law controls the interpretation of the language contained within the pre-1982 policies, nor that New York applies an injury-in-fact trigger for policy coverage (see *Maryland Casualty Co. v. W.R. Grace & Co.*, 23 F.3d 617, 625-26 (2d Cir. 1993)). The parties disagree, however, as to when "property damage" takes place within the meaning of the pre-1982 policies. The

insurers, in their cross-appeal, contend that the circuit court correctly found that "property damage" occurs only when a Qest system leaks, and that the appellate court erred in concluding that under New York law, diminution in value caused to the residence by the presence of a Qest system may constitute an "injury to tangible property," and, therefore, "property damage." The policyholders respond that the appellate court properly reversed the circuit court and correctly found that under the law of New York, an "injury to tangible property" may include tangible property which has been diminished in value by the Qest system to an extent greater than the value of the Qest system. We agree with the policyholders.

In *Sturges Manufacturing Co. v. Utica Mutual Insurance Co.*, 37 N.Y.2d 69, 72-73, 332 N.E.2d 319, 322, 371 N.Y.S.2d 444, 447-48 (1975), New York's highest court interpreted the "property damage" clause of a CGL policy which contained language identical to that in the pre-1982 policies at bar. In that case, Sturges, a manufacturer of ski straps, brought a declaratory judgment action against its insurer, seeking a declaration of the insurer's coverage obligations with respect to a breach of warranty and negligence action filed against Sturges by one of its customers, Americana, which had incorporated the straps into its own ski bindings. Americana sued Sturges when, due to allegedly defective stitching on the part of Sturges, the ski straps broke under stress and caused Americana's customers to return and cancel their orders for ski bindings. Americana claimed in the underlying suit that Sturges' straps, as a defective component of the bindings into which they were incorporated, diminished the value of, and caused harm to, the bindings as a whole. In holding that such claims could constitute an "injury to tangible property" within the meaning of the policy language, the Court of Appeals of

New York stated that "[w]hen one product is integrated into a larger entity, and the component product proves defective, the harm is considered to be harm to the entity to the extent that the market value of the entity is reduced in excess of the value of the defective component [citation]." *Sturges*, 37 N.Y.2d at 72-73, 332 N.E.2d at 322, 371 N.Y.S.2d at 447. The decision in *Sturges* stands for the proposition that, under New York law, an "injury to tangible property" includes tangible property which, as a result of the integration of a defective product, has been diminished in value to an extent greater than the value of the defective product.

Based upon the holding of the *Sturges* court, we agree with the appellate court below that the circuit court erred in holding that, under New York law, an "injury to tangible property" occurs only when a Qest system leaks. Under *Sturges*, the term "injury to tangible property" also includes the diminution in a home's value as a result of the presence of a Qest system, as long as that diminution is greater than the value of the Qest system itself.

Having determined what constitutes "property damage" within the meaning of the pre-1982 policies governed by New York law, we now turn to the question of when such damage occurs for purposes of triggering the insurers' duty to indemnify. As stated, the duty to indemnify arises when the insured has incurred liability in the underlying claims, and the insured's activity and resulting loss or damage actually falls within the coverage of the CGL policy. *Outboard Marine*, 154 Ill. 2d at 127-28; *Zurich*, 118 Ill. 2d at 52. The record indicates that the vast majority of Qest claims which have either been settled or have ended in judgment against the policyholders have resulted from leaks in the Qest system. The record also reveals that these claims sought recovery for, *inter alia*, water damage to the residence, the residence's fixtures, and personal property contained

within the residence. Accordingly, the policy coverage for the leak claims in which claimants recovered for water damage was triggered at the time the water damage occurred. However, the record further reveals that claimants alleging leaks in their Qest system also sought damages for the diminution in value of the residence resulting from the presence of the allegedly defective Qest system. It is unclear from the record exactly what type of damages were awarded to those claimants who prevailed on claims alleging Qest systems leaks. We cannot discern from the record if any part of the damages awarded to the leak claimants was for diminution in the value of their homes as a result of the Qest system and, if so, when this diminution occurred and whether the alleged diminution in value was greater than the value of the Qest system itself. In addition, the record further indicates that a minority of claims filed against the policyholders sought recovery for the diminution in value of the residential property due to the presence of the Qest system in the home prior to the system's leaking. However, the record is again unclear with respect to whether any settlement or judgment was entered against the policyholders in which diminution in value, within the meaning of *Sturges*, was actually awarded and, if so, when such diminution occurred.

Based upon the state of the record before us, we agree with the appellate court below that the circuit court erred in granting summary judgment in favor of the insurers who issued policies for periods prior to 1982. We also agree with the appellate court that the circuit court properly denied the policyholders' cross-motion for summary judgment with respect to the pre-1982 policies. As stated, summary judgment is proper only if the pleadings and evidence, when viewed liberally in favor of the non-moving party, establish that there is no genuine issue of material fact and the moving party is entitled to judg-

ment as a matter of law. *E.g.*, *Outboard Marine*, 154 Ill. 2d at 131-32.

The record before us establishes that there are disputed issues of fact material to the resolution of this issue. To the extent the parties are seeking a declaration with respect to the insurers' duty to indemnify, we remand this portion of the instant cause to the circuit court with instructions to determine, as to each claim for which indemnity is sought from the pre-1982 insurers, if covered "property damage" occurred within the relevant policy periods, with reference to the specific type of damage sought to be indemnified. We note that, at this time, such determination can only be made with respect to claims actually settled or which have come to judgment and for which the policyholders have incurred liability. We agree with the appellate court that a declaration with respect to the insurers' duty to indemnify is premature as to those cases still pending against the insurers. Such cases will become ripe at the time that the underlying claims are resolved.

## II. Post-1981 Policies

We next address the excess CGL indemnity policies issued to the policyholders by the insurers after 1981. The parties agree that these policies are governed by Illinois law. As stated, in construing the language of an insurance policy, the court's primary objective is to ascertain and give effect to the intent of the parties to the contract. *Koloms*, 177 Ill. 2d at 479; *Outboard Marine*, 154 Ill. 2d at 108. If the words of a policy are clear and unambiguous, "a court must afford them their *plain, ordinary, and popular meaning*." (Emphasis in original.) *Outboard Marine*, 154 Ill. 2d at 108. The post-1981 excess CGL policies issued by the insurers to the policyholders define "property damage" as "*physical* injury to *** tangible property which occurs during the policy period." (Emphasis added.) It is the addition of the word "physi-

cal" to this definition which distinguishes the policies issued for periods subsequent to 1981 from those policies issued for periods prior to 1982.

The policyholders assert that both the circuit and appellate courts erred in holding that, under Illinois law, the very installation of a Qest system within a residence did not constitute "physical injury to tangible property" and, therefore, did not constitute "property damage" within the meaning of the post-1981 policies. According to the policyholders, homes which contain the Qest system are "tangible property" that suffer "injury" as a result of the installation of a plumbing system which has a propensity to leak. The policyholders characterize the injury to the homes as "physical" because the defective Qest system was physically incorporated and connected to the residences and diminished the value of the residences from the moment the Qest system was installed.

In support of the "installation trigger" of coverage, the policyholders rely in principal part upon the majority opinion rendered by the United States Court of Appeals for the Seventh Circuit in *Eljer Manufacturing, Inc. v. Liberty Mutual Insurance Co.*, 972 F.2d 805 (7th Cir. 1992), and contend that the appellate court below erred in declining to adopt the rationale of the *Eljer* opinion. The policyholders also maintain that "Illinois asbestos property damage insurance coverage cases also support the incorporation doctrine," and assert that the appellate court below erred in concluding that such cases provided little or no guidance in resolving the issue at bar.

The insurers respond that the appellate court correctly affirmed the circuit court's denial of the policyholders' cross-motion for summary judgment on this issue. According to the insurers, the circuit and appellate courts properly determined that, under the policies' plain

language, the mere installation of a functioning Qest system into a residence does not constitute a "physical injury to tangible property" and thus does not trigger coverage under the post-1981 policies. The insurers further contend that the appellate court correctly determined that "physical injury" also does not encompass the diminution in value to a residence resulting from the failure of a Qest system to perform as promised. Relying upon the decisions of our appellate court in *Diamond State Insurance Co. v. Chester-Jensen Co.*, 243 Ill. App. 3d 471 (1993), and *Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.*, 218 Ill. App. 3d 956 (1991), the insurers assert that such an alleged diminution in value constitutes an intangible economic loss which is not covered under the policies' provisions. In addition, the insurers contend that the appellate court appropriately declined to follow the Seventh Circuit's majority opinion in *Eljer*, as *Eljer* ignored the plain meaning of the phrase "physical injury" and instead adopted a construction which fails to give effect to both words at the same time. Finally, the insurers maintain that the appellate court correctly determined that the asbestos cases relied upon by the policyholders are inapposite, for the matter at bar, unlike an asbestos action, does not involve the installation of a "contaminant" into another structure.

Because the issue before us is one of contract interpretation, we begin with an examination of the language of the disputed policies. It is clear from the arguments of the parties that their dispute focuses upon the meaning of the phrase "physical injury to tangible property." The policyholders maintain that this term is ambiguous and that a reasonable interpretation of the phrase is that coverage is triggered at the time a defective Qest system is incorporated into a home. The policyholders also contend that this court's decision in *American States In-*

*surance Co. v. Koloms*, 177 Ill. 2d 473 (1997), "require[s]" us to examine the relevant insurance industry drafting history of the post-1981 policies' definition of "property damage."

The arguments of the policyholders are misplaced. We do not find ambiguity in the phrase "physical injury to tangible property." In order to trigger coverage for "property damage," the plain language of the post-1981 policies requires that there be an injury to tangible property and that the injury be physical in nature. Because the words of the policy are unambiguous, it is unnecessary for this court to consider extrinsic evidence of the policy's purported meaning. Rather, we must afford the unambiguous policy terms their plain, ordinary and popular meaning. As this court has previously noted in *Outboard Marine*, the "usual and ordinary" meaning of a phrase is " 'that meaning which the particular language conveys to the popular mind, to most people, to the average, ordinary, normal [person], to a reasonable [person], to persons with usual and ordinary understanding, to a business [person], or to a lay[person].' " *Outboard Marine*, 154 Ill. 2d at 116, quoting 2 Couch on Insurance 2d § 15:18 (rev. ed. 1984). Webster's Dictionary defines "physical" as "of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary: MATERIAL, NATURAL." Webster's Third New International Dictionary 1706 (1993). Although Black's Law Dictionary does not contain a definition of the term "physical," it does define the term "physical harm" as "[a]ny physical impairment of land [or] chattels." Black's Law Dictionary 722 (7th ed. 1999). We conclude that, to the average, ordinary person, tangible property suffers a "physical" injury when the property is altered in appearance, shape, color or in other material dimension. Conversely, to the average mind, tangible property does not experience "physical" injury if that property suffers

intangible damage, such as diminution in value as a result from the failure of a component, such as the Qest system, to function as promised.

In their submissions to this court, the policyholders argue at great length that, pursuant to the reasoning of the majority opinion in the 1992 decision by the United States Court of Appeals for the Seventh Circuit in *Eljer Manufacturing Corp. v. Liberty Mutual Insurance Co.*, 972 F.2d 805 (7th Cir. 1982), this court should hold that the incorporation of a defective product into a larger entity triggers coverage for "property damage" within the meaning of the post-1981 policies. In *Eljer*, the Seventh Circuit was presented with a federal diversity action in which Eljer Manufacturing, Inc., one of the policyholders at bar, brought a declaratory judgment action against its primary liability insurers, requesting a declaration of whether and when "property damage" coverage under the policies was triggered with respect to underlying claims for failure of the same Qest systems at issue in the instant cause. A divided panel of the Seventh Circuit concluded that, under Illinois law, " 'physical injury to tangible property' " occurred at the time of the installation of the Qest plumbing systems. *Eljer*, 972 F.2d at 814. Thus, contrary to our holding today, the *Eljer* panel determined that the mere installation of the Qest systems triggered coverage for the claims, under policy language identical to that at issue at bar.

In their argument to this court, the policyholders, while acknowledging that we are not bound to follow the federal decision in *Eljer* (see *City of Chicago v. Groffman*, 68 Ill. 2d 112, 118 (1977) ("The general rule is that decisions of United States district and circuit courts are not binding upon Illinois courts"); *Hinterlong v. Baldwin*, 308 Ill. App. 3d 441, 452 (1999)), nevertheless vigorously urge us to adopt that decision's reasoning and likewise hold in their favor on this issue. The insurers counterar-

gue with equal vigor that *Eljer* was incorrectly decided under Illinois law. We agree with the insurers.

As stated above, it is a well-settled precept of Illinois law that because the primary objective in interpreting the provisions of an insurance policy is to give effect to the parties' intentions, where a policy provision is clear and unambiguous, its language must be taken in its plain, ordinary and popular sense. *Outboard Marine*, 154 Ill. 2d at 108. In *Eljer*, the majority deviated from this fundamental rule of Illinois law. After first finding that "[t]he central meaning of the term ['physical injury'] as it is used in everyday English *** is of a harmful change in appearance, shape, composition, or some other physical dimension of the 'injured' person or thing," the *Eljer* panel then expressed concern with respect to a perceived "conflict between the connotations of the term 'physical injury' and the objective of insurance." *Eljer*, 972 F.2d at 808-09. In an apparent effort to address this "conflict," the *Eljer* majority rejected the concept that words or phrases used in insurance policies are always to be interpreted in their ordinary language sense, and stated that "[w]e should at least ask what function 'physical injury' might have been intended to perform in a comprehensive general liability policy apart from just drawing a commonsensical, lay person's ordinary-language distinction ***." *Eljer*, 972 F.2d at 809-10. The majority then concluded that, based upon a review of the admittedly "sparse" drafting history of CGL policies, the term "physical injury" does not require that the covered property actually be "injured" in a "physical" sense as a result of the Qest systems, but only that the claimants suffered *any* "loss that results from physical contact, physical linkage" with the defective Qest systems. *Eljer*, 972 F.2d at 810.

Had the *Eljer* court applied its own ordinary-meaning interpretation of the phrase "physical injury" to the

claims presented, the result would have been the same as our result today: without a "harmful change in appearance, shape, composition, or some other physical dimension" (*Eljer*, 972 F.2d at 809) to the claimants' property, the insurance coverage is not triggered. We believe that the *Eljer* majority erred when it set aside the "central," plain, and ordinary meaning of the term "physical injury," and instead employed an admittedly "conjectured" analysis with respect to the function that the phrase was intended to perform in a CGL policy. As Judge Cudahy pointed out in his dissenting opinion:

"There is immediately something counter-intuitive about saying that physical injury has been done to a house in which a functioning plumbing system has been installed. Of course, when we determine later (years later) that a good number of the systems will fail—five percent in this case—then perhaps there is a sense in which the 'injury' was present from the moment of installation ***. But is there *physical* injury? *** The majority's account cannot give both words meaning at the same time. Something *physical* occurs when the plumbing is installed—but it is not injury; and we might say that there is *injury* (of a sort) when the plumbing is installed—but it is not physical." (Emphases in original.) *Eljer*, 972 F.2d at 814-15 (Cudahy, J., dissenting).

After arriving at its definition of "property damage" within the meaning of the post-1981 policies, the *Eljer* majority stated that "[s]o far we have been discussing this case as if it had to be decided on the basis of first principles, and that is nearly true," because, in the majority's view, the "cases are unclear" with respect to whether Illinois accepted the "incorporation concept" of property damage under the "physical injury" definition. *Eljer*, 972 F.2d at 812. According to the *Eljer* majority, the "parties spen[t] too much time" discussing our opinion in *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64 (1991), because it was "unclear" from that decision whether this court

generally accepted the "incorporation theory" of "physical injury." *Eljer*, 972 F.2d at 813. The *Eljer* majority then stated that the "closest case" was the 1987 Illinois Appellate Court decision in *Marathon Plastics, Inc. v. International Insurance Co.*, 161 Ill. App. 3d 452 (1987), in which the court held that the diminution in value to an entity caused by the mere incorporation of a defective component constituted "property damage" under a policy defining property damage as " 'physical injury to tangible property.' " The majority in *Eljer* concluded that there was "no contrary authority [to *Marathon*] in Illinois" (*Eljer*, 972 F.2d at 813), despite the fact that the *Eljer* majority specifically noted that, subsequent to the *Marathon* decision, a different division of our appellate court, in *Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.*, 218 Ill. App. 3d 956 (1991), had determined that intangible damages, such as diminution in value, do not constitute a "physical" injury. For the reasons discussed in detail below, we find the *Eljer* majority's interpretation of relevant Illinois case law to be flawed. We will discuss the cases cited by the *Eljer* majority *seriatim*.

In *United States Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 144 Ill. 2d 64 (1991), this court was presented with the question of whether the installation of insulation containing asbestos in schools and other public buildings constituted "property damage" within the meaning of CGL policies which, identical to the post-1981 policies at bar, defined "property damage" as "physical injury to *** tangible property." We held that "asbestos fiber contamination constitutes physical injury to tangible property, *i.e.*, the buildings and their contents." *Wilkin*, 144 Ill. 2d at 75. Although, in the *Eljer* majority's view, the basis of our holding was unclear, we specifically explained that the property was "physically" injured as a result of the presence of toxic asbestos fibers

within the structures, as "the buildings and their contents (*e.g.*, carpets, upholstery, drapes, etc.) are virtually contaminated or impregnated with asbestos fibers, the presence of which poses a serious health hazard to the human occupants." *Wilkin*, 144 Ill. 2d at 75. Thus, this court concluded that "the contamination of the buildings and their contents" due to the continuous release of these toxins constituted "physical injury" under the policies. *Wilkin*, 144 Ill. 2d at 77-78.

Our decision in *Wilkin* recognized the unique nature of asbestos products, which disseminate toxic fibers upon installation and continuously contaminate a structure and its contents subsequent to installation. It follows, therefore, that this contamination, which *Wilkin* held constituted the "physical" injury to the property, occurs upon installation of these toxic products. *Wilkin* was premised upon the specific facts before the court in that case and not upon a general proposition that incorporation of a defective component into another structure constitutes "physical injury." Accordingly, the argument advanced by the policyholders in their submissions to this court that *Wilkin* and its progeny support their conclusion that the mere incorporation of a defective component constitutes a "physical" injury to property is inapposite. We agree with the appellate court below that, "[u]nlike the asbestos cases cited by the Policyholders, [the cause at bar] does not involve the installation of any contaminant," as the Qest systems are "not alleged to contain any toxic substances" and the "defective nature of the system is related solely to its propensity to leak prematurely, that is, its failure to perform as intended." 307 Ill. App. 3d at 879.

Further, the *Eljer* majority's reliance on the 1987 decision of our appellate court in *Marathon Plastics, Inc. v. International Insurance Co.*, 161 Ill. App. 3d 452 (1987), was misplaced. In *Marathon*, the insured, Marathon

Plastics, manufactured polyvinylchloride (PVC) pipes and sold these pipes for use in the construction of a rural water district. It was subsequently discovered that the system leaked due to defective seals which Marathon had incorporated into the pipe. The purchaser of the pipe looked for signs of the leak, dug up the pipejoint, cut both sides of it, inserted a new piece of PVC pipe, and reburied the lines. Thereafter, the purchaser made a written demand on Marathon for the labor and material costs incurred in the repair of the leaks. After settling the claim, Marathon sought indemnification from its insurer for the amount paid on the claim. The insurer responded that no "property damage" within the meaning of Marathon's policy had occurred. The policy issued to Marathon defined "property damage," as do the post-1981 policies at issue in the cause at bar, as "physical injury *** to tangible property" which occurred during the policy period.

The appellate court held that "property damage" within the meaning of Marathon's policy had occurred because, as a result of the leaks, the water system was diminished in value "even though *no physical injury occurred* to the water system." (Emphasis added.) *Marathon*, 161 Ill. App. 3d at 463. In arriving at this conclusion, the *Marathon* court principally relied upon the reasoning in an earlier appellate court decision, *Pittway Corp. v. American Motorists Insurance Co.*, 56 Ill. App. 3d 338 (1977), which held that including defective plastic valves in aerosol cans of hairspray caused "property damage" to the extent that the market value of the final product was diminished, less the cost of the defective valve itself. *Pittway*, 56 Ill. App. 3d at 341. Despite the fact that the policy in *Pittway* defined "property damage" as " 'injury to or destruction of tangible property' " (*Pittway*, 56 Ill. App. 3d at 341), and *not* as a "*physical* injury to or destruction of tangible property," the *Mara-*

*thon* court inexplicably stated that the "property damage" definition in the *Pittway* policy was "virtually identical" to that at issue in *Marathon*. *Marathon*, 161 Ill. App. 3d at 461.[5]

We conclude that *Marathon* was erroneously decided. The court in *Marathon* failed to give any effect to the actual language of the policies at issue in that case. Although the policies defined "property damage," as do the post-1981 policies at bar, as "physical injury to tangible property," the *Marathon* court improperly disregarded the policies' requirement of *physical* injury, explicitly stating that insurance coverage was triggered "even though no physical injury occurred." *Marathon*, 161 Ill. App. 3d at 463. The *Marathon* court arrived at this holding by erroneously relying upon earlier appellate court cases which interpreted a different definition of "property damage," one that did not include the word "physical." As we have explained above, under the plain meaning of the word, a "physical" injury occurs when property is altered in appearance, shape, color or in other material dimension, and does not take place upon the occurrence of an economic injury, such as diminution in value. Accordingly, we overrule the *Marathon* decision.

The *Eljer* majority stated that there was "no contrary authority in Illinois" to *Marathon*, a decision which we have now overruled, despite the majority's acknowledgment that the insurers in the *Eljer* case "place[ed] particular weight" upon a subsequent decision of our ap-

[5]As additional support for its conclusion that "property damage" occurred under the facts presented, the *Marathon* court also made citation to, and discussed, *Elco Industries, Inc. v. Liberty Mutual Insurance Co.*, 90 Ill. App. 3d 1106 (1980). The *Elco* court, citing to the decision in *Pittway*, held that "property damage," defined in the *Elco* policies as simply "injury to the tangible property," includes "tangible property which has been diminished in value or made useless irrespective of any actual physical injury to the tangible property." *Elco*, 90 Ill. App. 3d at 1111.

pellate court. In that case, *Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.*, 218 Ill. App. 3d 956 (1991), the insured general contractors were sued by the State of Illinois for various acts and omissions in the installation, design and manufacture of a heating, ventilation and air conditioning system (HVAC) in the State of Illinois Center. One element of damages sought by the State was the expense in repairing the system. The insurer filed an action for declaratory judgment alleging that the underlying claims were grounded in the State's "disappointed commercial expectations" because the contractor failed to install an HVAC system that would properly cool the building. The insurer argued that because the underlying action sought damages for economic loss, it did not fall within the definition of "property damage" under the policy, which defined this term, as do the post-1981 policies at bar, as "physical injury" to tangible property. The insureds counterargued that the complaint alleged property damage for a defective or inadequate HVAC system that failed to function properly and had to be replaced.

The appellate court agreed with the insurer and held that the underlying claims failed to allege "property damage" as defined under the policy because no facts existed establishing that a "physical injury" to tangible property had occurred. Although the insureds argued that "property damage" would take place because, during the repair work, the State would have to remove and replace or repair ceilings and other portions of the building, the court concluded that this did not alter the fact that the underlying claims were grounded in a breach of contract that resulted in disappointed commercial expectations, and the State was seeking to recover for the economic loss sustained as a result of the expense incurred in repairing the system. *Bituminous*, 218 Ill. App. 3d at 963-64. Although the insureds attempted to rely upon

our decision in *Wilkin* to support their position, the appellate court panel correctly concluded that "[w]e do not find this case analogous to the toxic fibers permeating the school buildings in *Wilkin*." *Bituminous*, 218 Ill. App. 3d at 966. The appellate court stressed that "no detrimental effect" occurred to the State of Illinois Center as a result of the faulty HVAC system, and that the underlying claims were premised upon the allegation that "the air conditioning system did not do the job the State expected." *Bituminous*, 218 Ill. App. 3d at 966. Thus, the *Bituminous* ruling holds that intangible damage, such as diminution in value resulting from a product's failure to perform as promised, does not constitute a "physical" injury within the meaning of the post-1981 policies.

Clearly, *Bituminous* constitutes "contrary authority" to *Marathon*. As Judge Cudahy aptly pointed out in his dissenting opinion in *Eljer*, *Bituminous* was not only "the more recent case," it also "discusses, and makes sense of" our decision in *Wilkin*. See *Eljer*, 972 F.2d at 816-17 (Cudahy, J., dissenting).

We note that our appellate court has subsequently expanded upon the reasoning and holding of the *Bituminous* decision. In *Diamond State Insurance Co. v. Chester-Jensen Co.*, 243 Ill. App. 3d 471 (1993), the court was faced with the identical claims filed with respect to the identical liability insurance provisions at issue in *Bituminous*, but which involved an insured who was the manufacturer of the refrigeration equipment incorporated into the HVAC system installed in the State of Illinois Center. In *Diamond State,* the court relied upon its decision in *Bituminous* in holding that "[m]ere allegations of repair and modification without any allegations of physical injury are insufficient to involve coverage" under policies requiring a "physical" injury to tangible property. *Diamond State*, 243 Ill. App. 3d at 480. The court found that the underlying claims stated no physical

injury to tangible property, but only asserted that the refrigeration units failed to perform their anticipated function and requested the cost of repairing or replacing the units. Although the insured in *Diamond State* relied heavily upon earlier appellate court decisions such as *Pittway* and *Marathon*, the court determined this reliance was "misplaced." The court observed that the "coverage requirements in *Pittway* were entirely different from the requirements of the policies here in issue *** [because they] did not require 'physical injury' as a prerequisite for recovery." *Diamond State*, 243 Ill. App. 3d at 481. Further, the court noted that "[t]he analysis in *Marathon* is inconsistent with the clear language and underlying purpose of the policies. Insurance policies must be interpreted by the standard of construction and interpretation of contracts in general. [Citations.] The language of the policy explicitly requires 'physical injury.' It cannot be construed to provide coverage on the basis of loss or diminished use simply resulting from the failure of a component to perform as promised." *Diamond State*, 243 Ill. App. 3d at 482. The court went on to observe that "[t]he construction followed in *Marathon* and urged here by [the insured] ignores the overall purpose and design of a comprehensive general liability policy. If the *Marathon* interpretation were to be adopted as urged by [the insured], the policy would not only provide insurance against tort liability, but would function as a performance bond as well." *Diamond State*, 243 Ill. App. 3d at 482.

For the foregoing reasons, we conclude that the interpretation and application of relevant Illinois case law by the *Eljer* majority is flawed. We reject the argument proffered by the policyholders that we should adopt the reasoning and holding in *Eljer* with respect to determining when coverage for "property damage," within the meaning of the post-1981 policies, is triggered. Further, in light of our holding, it is unnecessary for us to address

those cases from other jurisdictions, cited by the policyholders in their submissions to this court, which have followed the *Eljer* opinion.

In sum, this court now finds that, under its plain and ordinary meaning, the term "physical injury" unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension. We reject the policyholders' assertions that, under the post-1981 excess CGL policies, the very installation of a functional Qest system into a structure constitutes "property damage." Insurance coverage is not triggered where the Qest system does not cause any physical injury to tangible property during the policy period and performs as intended. The plain language of the policies unambiguously states that the insurable event which gives rise to the insurers' obligation to provide coverage is the *physical* damage to tangible property. The term "physical" limits the word "injury" in the policies' definition of "property damage."

We also conclude that under its plain and ordinary meaning, the phrase "physical injury" does not include intangible damage to property, such as economic loss. We agree with the rulings of our appellate court in *Bituminous* and *Diamond State* that the diminution in value of a whole, resulting from the failure of a component to perform as promised, does not constitute a *physical* injury. We hold that the appellate court below correctly concluded that indemnity coverage under the post-1981 policies at bar is not triggered by "[p]urely economic losses, such as damages for inadequate value, costs of repair or replacement, and diminution in value" that result from "a product's inferior quality or its failure to perform for the general purposes for which it was manufactured and sold *** absent physical injury to tangible property." 307 Ill. App. 3d at 884.

Indeed, adopting the interpretation of "property dam-

age" advanced by the policyholders would lead to absurd results. First, if we were to hold that the installation of a fully functional plumbing system constituted "physical injury to tangible property," we would effectively eliminate the word "physical" from the policies' definition of "property damage" and thereby fundamentally alter the terms of the insurance contract entered into between the parties. Construing "physical injury" in this manner would violate the paramount rule in interpreting policy provisions, which is to ascertain and give effect to the intent of the parties. See *Outboard Marine*, 154 Ill. 2d at 115.

In addition, if we were to accept the policyholders' argument that, even though a product fails years after its installation, the "property damage" can nevertheless be backdated to the time the product was initially installed, this would lead to the absurd result that liability insurance policies are triggered not by the actual product failure, but instead by the potential for the product's failure in the future. Although the installation of a Qest system in a residence exposes the homeowner to an approximately 5% risk that the system may fail at some point in the future, the installation remains an "exposure to conditions," which does not trigger coverage under the post-1981 policies. We further agree with the observation of *amicus* that "[t]o allow the [policyholders] to reach back in time and trigger old policies *** would eviscerate another critical term of the policies: the policy period. Insurance contracts do not provide perpetual coverage; they provide coverage only for injury that actually occurs during a finite policy period. Absent the ability to define and limit contractual risks, insurers cannot effectively spread those risks and contain the costs of insurance."

Finally, we observe that if we were to interpret the post-1981 excess CGL policies as urged by the policyhold-

ers, "the policy would not only provide insurance against tort liability, but would function as a performance bond as well." *Diamond State*, 243 Ill. App. 3d at 482; *Qualls v. Country Mutual Insurance Co.*, 123 Ill. App. 3d 831, 833-34 (1984). As explained more fully in *Qualls*:

> "[C]omprehensive general liability policies *** are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses. [Citations.] Finding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond." *Qualls*, 123 Ill. App. 3d at 833-34.

Accordingly, the circuit court correctly denied the policyholders' cross-motion for summary judgment on the trigger of coverage issue with respect to the post-1981 policies.

Having defined the term "physical injury to tangible property" within the meaning of the post-1981 excess CGL policies, we now determine when such damage occurs, under the facts before us, for purposes of triggering the insurers' duty to indemnify. We hold that coverage under the post-1981 policies is triggered ("property damage" takes place) at such time that a claimant suffers "physical injury to tangible property" in the form of water damage due to leaks from the Qest system. Accordingly, coverage under the post-1981 policies is not triggered if the date of the "physical injury"—the water damage due to a leak—occurs after the policy period, even if the installation of the Qest system occurs within the policy period.

As previously stated, the duty to indemnify arises when the insured has incurred liability in the underlying claims, and the insured's activity and resulting loss or damage actually falls within the coverage of the CGL policy. *Outboard Marine*, 154 Ill. 2d at 127-28; *Zurich*, 118 Ill. 2d at 52. As observed above in the course of the

discussion of the pre-1982 policies, the vast majority of Qest claims which have either been settled or have resulted in judgment against the policyholders are cases in which an actual leak of the Qest system occurred. The record also reveals that these claims sought recovery for, *inter alia*, water damage to the home, the home's fixtures, and personal property contained within the residence. We hold that the insurers' duty to indemnify the policyholders for leak claims in which claimants recovered for these specific damages was triggered at the time the water damage occurred. The insurers have no duty to indemnify the policyholders, however, for any damages recovered by leak claimants for the diminution in value of the residence resulting from the presence of the allegedly defective Qest system. As previously determined, such purely economic losses, resulting from the Qest system's failure to perform for the general purposes for which it was manufactured and sold, do not trigger coverage under the post-1981 policies in the absence of a "physical" injury to the property. Accordingly, we affirm the circuit court's grant of summary judgment on this issue as to the post-1981 insurers.

However, because this is a duty-to-indemnify action, we agree with the appellate court that a declaration with respect to the insurers' duty to indemnify is premature as to those cases still pending against the insurers. As stated, such cases will become ripe at the time that the underlying claims are resolved.

As a final matter, we note that the record further reveals that a minority of claims filed against the policyholders sought recovery for the diminution in value of the residential property due to the presence of the Qest system in the home *prior* to the systems' leaking, as well as the cost of replacing those systems. We hold that coverage under the post-1981 policies is not triggered in the context of a claimant's voluntary decision to replace

a fully functional Qest system prior to the development of a leak. Although a claimant may understandably be concerned by reports that an estimated 5% of the Qest systems have experienced failures, the damage caused to a home by the removal of a functional system prior to a leak does not constitute "physical injury to tangible property" arising from a covered occurrence under the policies. The "injury" caused *by the Qest system* under these facts flows from the claimant's disappointed commercial expectations in the performance of the Qest system and is not an injury which is "physical" in nature.[6] As stated, the post-1981 policies do not provide coverage for economic loss claims against the policyholders. Consistent with the policy language agreed upon by the parties to the insurance contract, the insurers did not consent to become guarantors of the product quality or the performance of the Qest systems. We therefore agree with the insurers in their cross-appeal that the appellate court erred in finding that coverage under the post-1981 policies may be triggered prior to the occurrence of an actual leak if, in the course of replacing the Qest system, actual physical damage is caused to the home itself. Accordingly, we reverse the judgment of the appellate court on this issue.

## CONCLUSION

For the foregoing reasons, the circuit court's grant of summary judgment is reversed as to the pre-1982 insurers and affirmed as to the post-1981 insurers. The appellate court's judgment is affirmed, with the exception of its holding concerning the voluntary removal of a non-leaking Qest system, which is reversed. The cause is

[6] We note that our decision today does not preclude homeowners from obtaining compensation for their economic losses from the manufacturer of a defective product or, where appropriate, those in the line of the distribution of the product.

remanded to the circuit court for further proceedings consistent with this opinion.

*Appellate court judgment affirmed in part*
*and reversed in part;*
*circuit court judgment affirmed in part*
*and reversed in part;*
*cause remanded.*