**FIDELITY & DEPOSIT COMPANY OF MARYLAND, Plaintiff,**

v.

**HARTFORD CASUALTY INSURANCE COMPANY, Defendant.**

**Case No. 01–2015–JWL.**

United States District Court, D. Kansas.

June 25, 2002.

J. Nick Badgerow, Spencer, Fane, Britt & Browne, Overland Park, KS, for Plaintiff.

Lee M. Baty, Theresa A. Otto, Randall W. Brown, Baty, Holm & Numrich, P.C., Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This duty to defend and indemnify action arises out of an insurance coverage dispute over faulty workmanship on a construction project in LaCygne, Kansas. Plaintiff Fidelity & Deposit Company of

Maryland ("F & D") claimed that defendant Hartford Casualty Insurance Company ("Hartford") breached its duties to defend and indemnify its insured parties, National Contractors, Inc. ("National") and Midwest Drywall, Inc. ("Midwest Drywall"), under a Commercial General Liability ("CGL") policy and an Umbrella policy. This court previously granted partial summary judgment on liability to plaintiff. *Fidelity & Deposit Co. of Maryland v. Hartford Cas. Ins. Co.,* 189 F.Supp.2d 1212 (D.Kan.2002).

A trial to the court on damages was held in this matter in May of 2002. The court has thoroughly considered the evidence and arguments presented at the damages trial and is now prepared to issue its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons set forth fully below, the court concludes that F & D is entitled to $1,680,818.13 in damages. Specifically, F & D is entitled to $1,000,000.00 for damages National incurred as a result of property damage to the project and $680,818.13 for attorneys' fees and expenses National incurred in the underlying lawsuit against it. The court further concludes that F & D is not entitled to an award of attorneys' fees for expenses incurred in this action.

## I. Background

Although the facts underlying this case are set out in detail in the court's February 27, 2002, Memorandum and Order, *Fidelity & Deposit Co. of Maryland v. Hartford Cas. Ins. Co.,* 189 F.Supp.2d 1212, 1213–15 (D.Kan.2002), and in the parties' stipulated facts, by way of background the court will incorporate a brief summary of those facts here.

Hartford issued two insurance policies to Midwest Drywall, each of which added National as an additional named insured. The first policy, the CGL policy, has policy limits of $1,000,000. The second policy, the Umbrella policy, has policy limits of ten million dollars.

Prairie View, Kansas School District (the "School District") hired National pursuant to an owner/contractor agreement to construct a performing arts center and middle school (the "project") in LaCyne, Kansas. F & D issued a performance bond with National as the principal and the School District as the obligee, bonding the performance of the project. As a condition of issuing the performance bond, National and Midwest Drywall entered into a written agreement with F & D in which they promised to indemnify F & D for all losses which F & D might sustain as a result of F & D having to complete the project on National's behalf.

In September of 1997, National began work on the project. The project consisted of three areas: Area A, an auditorium, commons and kitchen; Area B, a gymnasium, some classrooms and a media center; and Area C, classrooms and administration. On July 21, 1998, the School District purported to issue a stop-work order on portions of the project to National, but it failed to enforce or observe the terms of that order and continued to pay National for work performed thereafter. On October 22, 1998, after determining that National's work on the project was defective, the School District terminated National, and F & D completed the project through another contractor pursuant to its performance bond obligations. During F & D's completion of the project, it determined that much of Areas B and C needed to be demolished and rebuilt, and a part of Area A would also need to be repaired.

On June 16, 1999, the School District filed a lawsuit against National and F & D. On August 24, 1999, the School District amended its petition against National and F & D asserting, in part, that National was negligent in its work on the project.

F & D filed a cross-claim against National and Midwest Drywall seeking reimbursement of damages sustained by F & D to satisfy claims of the School District. Later, F & D filed a lawsuit in federal court against National, Midwest Drywall and other defendants to enforce the indemnification agreement between the parties in an attempt to recover expenses it had incurred to complete the project.

After Hartford was notified of the School District's lawsuit by its insured, Hartford investigated the claim and determined from the available facts and under applicable case law that it believed the claim fell outside of the policies' coverage and, therefore, it had no duty to defend or indemnify National or Midwest Drywall.

On October 5, 2000, a settlement was reached between National, Midwest Drywall and F & D. Under the settlement agreement, National agreed to pay F & D $4,638,500. Additionally, National and Midwest Drywall assigned to F & D any rights they may have had under the Hartford CGL and Umbrella policies.

On January 9, 2001, F & D filed this lawsuit against Hartford seeking damages for Hartford's breach of its duties to defend and indemnify its insured parties, National and Midwest Drywall, under the terms of the CGL and Umbrella policies.

In its February 27, 2002, Memorandum and Order, this court granted partial summary judgment on liability in favor of plaintiff. *Fidelity & Deposit Co. of Maryland v. Hartford Cas. Ins. Co.*, 189 F.Supp.2d 1212 (D.Kan.2002): Specifically, the court concluded that the cracked walls and other physical damage to the project caused by National's faulty workmanship constituted an occurrence that resulted in property damage; that Hartford waived its right to rely on policy exclusions not set out in the pretrial order; that the Umbrella policy would drop down to provide coverage in the event that there were any gaps in the CGL policy; that the policy exclusions contained in the Umbrella policy and listed in the pretrial order did not exclude the property damage to the project from coverage under the Umbrella policy; and, finally, that Hartford had a duty to defend its insured parties, National and Midwest Drywall, in the underlying lawsuits against them. Thus, having previously determined that Hartford is liable, the final issue for the court to address is the amount of damages to which F & D is entitled to recover on behalf of National and Midwest Drywall.

## II. Discussion[1]

F & D is pursuing a contract claim assigned to it by National and Midwest

---

1. During the course of trial, the court took under advisement three motions made on behalf of both parties. The court will now rule on these motions. In short, the court grants Hartford's motion to exclude any claim for expenses not directly related to property damage (Doc. 62) to the extent that Hartford is arguing that the damages are limited to those that fall under the Umbrella policy. The policy, however, is broader than Hartford contends. According to the Umbrella policy, the expenses recoverable are " 'damages' [the insured must pay] ... because of ... 'property damage.' " Thus, damages caused by property damage would also be covered.

The court grants Hartford's motion to strike and/or object to plaintiff's scope of proposed

issues (Doc. 63) to the extent that Hartford is arguing that F & D may not rely on an incidental contract theory. The motion is denied, however, to the extent that Hartford is arguing that F & D cannot argue that it is entitled to damages that it sustained. The issues raised in the first two motions are addressed in further detail by the court in this order. Finally, the court grants F & D's Motion in Limine to exclude evidence or re-argument regarding liability (Doc. 65). F & D argues that Hartford may not argue that the "Builder's Risk Policy" or surety bond constitute an "insurance policy" because those arguments were not preserved in the pretrial order or argued at the summary judgment stage. The court agrees. Moreover, Hartford did not

Drywall. F & D, as the assignee, stands in the shoes of National and Midwest Drywall, the assignors, to pursue claims that Hartford breached its duties to defend and indemnify its insured parties. The burden of proof is on F & D to prove the breach and the loss that results from the breach. *Sours v. Russell*, 25 Kan.App.2d 620, 967 P.2d 348, 351 (1998) (citing *Fox v. R.D. McKay Motor Co.*, 188 Kan. 756, 366 P.2d 297 (1961) (further citations omitted)). The measure of damages is "the loss directly and naturally resulting from the breach." *Id.* (citing *Ricklefs v. Clemens*, 216 Kan. 128, Syl. ¶ 1, 531 P.2d 94 (1975)); *Kansas State Bank v. Overseas Motosport, Inc.*, 222 Kan. 26, 563 P.2d 414, 415 (1977) (noting that Kansas follows the rule of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145, 5 Eng. Rul. Cas. 502 (1854)). Having previously found that a breach occurred (National had a contractual right to be defended and indemnified by Hartford and Hartford declined to defend and indemnify National), the court must now determine the amount of damages to National and Midwest Drywall that directly and naturally resulted from Hartford's breach.

 Under Kansas law, in a duty to defend case the insured has the burden of proving damages. *George R. Winchell, Inc. v. Norris*, 6 Kan.App.2d 725, 633 P.2d 1174, 1178 *rev. denied* 230 Kan. 817 (1981). In *Winchell*, the court explained that an insurance company that wrongfully refuses to defend its insured is liable for the following damages: (1) the full amount of any judgment or reasonable settlement up to the policy limits; (2) the expenses incurred by the insured in defending the lawsuit; and (3) any additional damages traceable to the insurer's refusal to defend. *Id.* at 1176. In *Winchell*, the full amount of the judgment was covered under the insurance policy; therefore, the court did not address the issue of whether an insurer that breaches its duty to defend is liable for a portion of the insured's settlement that is attributable to claims not covered by the policy. In fact, no Kansas courts have addressed the particular issue.

The Eighth Circuit recently addressed the precise issue in *Esicorp, Inc. v. Liberty Mutual Ins. Co.*, 193 F.3d 966, 970 (8th Cir.1999). In *Esicorp*, the Eighth Circuit, applying Missouri law, held: "[A]n insurer's liability when the insured has settled the underlying action may not exceed the policy coverages; therefore, a settlement encompassing both covered and noncovered claims must be fairly apportioned between the two." *Id.* at 971. The decision is consistent with other courts that have dealt with the issue. *See, e.g., Lang Tendons, Inc. v. Northern Ins. Co. of New York*, 2001 WL 228920, at *11 (E.D.Pa. March 27, 2001) (holding that when the insured has settled the underlying claim, the court must apportion the settlement between covered and uncovered claims) (listing cases from other circuits reaching a similar result). The court, finding *Esicorp* persuasive and not finding anything directly to the contrary, concludes that the Kansas Supreme Court would similarly adopt the principle.

In sum, in order to determine the amount of damages that directly and naturally resulted from Hartford's breach, the court must first determine what portion of the total damages sustained by National is covered by the Umbrella policy and, if necessary, apportion the damage amount between covered and uncovered losses. Next, the court must determine the total amount of attorneys' fees incurred in defending the underlying litigation.

provide evidence at trial to support its contention that the policy or surety bond reimbursed

National for any of its losses. Thus, Hartford's argument would fail on the *merits*.

## A. Covered Damages

At trial, F & D argued that it is entitled to the following damages it alleges were sustained by National and F & D: $4,638,500 for National's settlement with F & D, $2,097,839.58 for money withheld by the School District for work performed by National on the project, $20,876.10 for National's engineering and testing expenses and $3,518,515.51 for F & D's out-of-pocket damages to rebuild the project.

F & D argued at trial that all of the expenses incurred to rebuild the project are attributable to property damage and, therefore, are recoverable. F & D contends the parties' stipulations of fact, the testimony of the witnesses and the expert reports establish that there was extensive property damage. Paragraph 17 of the stipulations states in relevant part: "Many of the masonry walls constructed on the project suffered significant deterioration. Several masonry walls were cracked, and blocks within the walls were cracked, crushed and broken." Paragraph 18 adds:

In addition to cracked and broken block[s], the School District identified additional defects, including cracking control joints, cracked mortar joints, hacked-in mechanical openings, wet insulation, cracking concrete floor slabs, cracked lintels, cut and deflected rook deck, bent and burnt flashing, mislocated lintels and control joints, and improperly backfilled storm drain lines.

At trial, F & D's counsel reviewed this list of damages with Dr. Stanage, the Superintendent of the Prairie View School District, and he agreed that all of the damages listed were present.

F & D reasoned at trial that given the severity of the damage, as illustrated by the multitude of defects listed in the fact stipulation, it is unquestionable that the building had to be torn down. F & D contends that by agreeing to paragraph 23 of the parties' stipulations of fact, Hartford conceded that the property damage necessitated the decision to tear down the project. Paragraph 23 states: "During F & D's completion of the Project, it determined that much of areas B and C needed to be demolished and rebuilt, and a part of area A would also need to be repaired. The damage was so pervasive and widespread that these extraordinary repairs were required."

Alternatively, F & D argued at trial that it should be awarded the full amount of rebuilding the project because, according to F & D, once defective work was incorporated into the project, property damage occurred and, therefore, even the repair and replacement of good work is covered property damage.

Relying on the Umbrella policy's language, Hartford, on the other hand, urged the court at trial to substantially reduce F & D's proposed damages. According to Hartford, a significant portion of the expenses incurred to fix the project resulted from F & D's performance bond obligation to make the project conform to the contract specifications, but were not caused by property damage. Specifically, Hartford argued that the driving force behind F & D's decision to tear down Areas B and C and substantially rebuild Area A of the school was the project's noncompliance with the contract specifications; however, according to Hartford, much of the work torn down did not contain property damage. In other words, Hartford is arguing that absent F & D's performance bond obligation to make the project conform to the contract specifications, the property damage, such as cracked walls, could have been fixed without having to tear down the project. Thus, Hartford believes that a significant portion of the expenses incurred to rebuild the project were not caused by property damage and, therefore, Hartford is not responsible for those costs.

Although Hartford did not offer an expert to testify live at trial to support its theory, it submitted a number of different engineers' reports documenting the damage to the project, including several that Weiss, Janney, Elstner Associates, Inc. ("WJE") performed on the project on behalf of the School District. For the reasons explained below, the court agrees with Hartford's reasoning.

## 1. Findings of Fact

At trial, it was established that National initially provided Hartford with oral notice of a potential claim and then later written notice of an actual claim. Clay Davis testified that he orally notified his Hartford agent, Donald Deutsch, in July of 1998 that the School District was questioning some of the masonry work on the project. National's counsel, George Quatman, testified at trial that within ten days to two weeks after August 24, 1999, the date the School District amended its petition against National to include a claim of negligence, National sent a written notice of claim to Hartford requesting that Hartford defend and indemnify National in the lawsuit brought by the School District.

F & D documented at trial that on December 21, 2001, F & D and National entered into a settlement agreement with the School District whereby the School District released all of its claims against F & D and National relating to the owner/contractor agreement. Under the settlement agreement, F & D recovered a net amount of $2,700,000 from the School District.

The trial testimony was not conclusive as to whether the School District required the project to be torn down. Mr. Davis testified that the School District insisted on having the project torn down. Dr. Stanage's testimony was equivocal, however. He testified that the School District wanted a new school but would have been happy if the school, after being repaired, looked like a new building.

The trial testimony established that F & D's decision to tear down the project instead of attempting to fix it to conform to the contract specifications was based on extensive testing and research. From October of 1998, when the School District terminated National, until March of 1999, F & D was in charge of making decisions on how to proceed with the project. Tracy Lee Haley, F & D's agent who was in charge of the project, testified that she traveled to LaCygne and engaged a team of experts, including structural and masonry experts, to inspect the project and advise her on the appropriate course of action. The experts made a mockup room in a classroom in Area B. The experts opened up the walls and attempted to repair the damage. Ms. Haley testified that the experts advised her that it would be as costly to repair the project as it would be to tear it down and rebuild it.

Additionally, Ms. Haley testified that she questioned the feasibility of repairing the project because she did not believe that she could obtain enough remedial masons. She explained at trial that one of the major problems found in the mockup room was that the rebar was not continuous. It would come out of the ground but then there were gaps in the rebar up the wall. Thus, a primary reason the repair would have been more expensive was due to the type of mason required to repair the project. According to Ms. Haley, if the project were repaired to meet the contract specifications, it would have required hiring remedial masons to carefully cut-out and tie-in rebar that was missing from many of the project walls. She testified that they charge around $45 an hour, and while she found enough remedial masons to do the mock-up room, having brought them in from Canada, she could not have

found enough of them to repair the entire project to meet the contract specifications. She testified that as an alternative, if the building were torn down and rebuilt she could use new building masons that only charge between $15 and $18 per hour and were easily obtainable. Thus, in her view, the better decision was to tear down the school.

However, Clay Davis testified that he initially questioned whether tearing down the project was required. According to his initial calculations, Areas B and C of the project could be repaired for $1,000,000 versus tearing it down and replacing it for $3,200,000. In fact, Mr. Davis testified that as late as March of 1999, he still believed that Areas B and C of the project could be repaired to meet the contract specifications for $1,000,000. At that time, F & D believed the cost would be more in the range of $2,500,000 to $3,000,000. Mr. Davis readily admitted, however, that his calculations were based on what he thought and that he was not at the work site full-time. He also quickly conceded that F & D, with its first-hand data from the mockup room, had a better idea of the cost to repair the project to meet the contract specifications.

As the court will elaborate on below, based on Ms. Haley and Mr. Davis's testimony, the court believes that in the course of carrying out its performance bond responsibilities F & D likely made a good business decision to tear down and repair the project due to the potential for extensive damage in the future but the court is not persuaded that such a decision would have been necessary to repair only the physically injured property that currently

existed at the project.[2] The court's reasoning for this finding is set out below after discussing the definition of property damage (explaining that only property that was physically injured at the time the project was demolished may be considered property damage), making additional findings of fact to bring the issue fully into context and explaining how the damage to the property should be apportioned.

## 2. Conclusions of Law

In order to determine what portion of the damage to the project is covered by the Umbrella policy, the court must examine the language of the policy. As the court explained in the February 27, 2002, Memorandum and Order, the Umbrella policy states in the insuring agreement that the insurer will "pay those sums that the 'insured' must legally pay as 'damages' ... because of ... 'property damage'...." Under the Umbrella policy, property damage is defined as:

 a. Physical injury to tangible property, including all resulting loss of use of that property which occurs during the policy period. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

 b. Loss of use of tangible property that is not physically injured provided such loss of use is caused by an "occurrence" during the policy period. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Thus, the key terms of the Umbrella policy are " 'damages' ... because of ... 'property damage' ...." and "physical injury to tangible property."

---

**2.** The court rejects F & D's position that by agreeing to paragraph 23 of the stipulations of fact regarding the need for demolition and rebuilding, Hartford stipulated away the argument that the covered property damage did not necessitate tearing down the project. The court does not interpret the word "damage" in the stipulation as limited to property damage. Instead, the court believes it was intended to be used in the broader sense of referring to all of the defects at the project. Thus, the court does not regard the stipulation as going as far as F & D argues.

### The Incorporation Theory

As explained above, F & D argues that the incorporation of the faulty workmanship into the project led to covered property damage and, therefore, all direct and consequential expenses resulting from that damage are covered losses. In support of the position, F & D cited to an opinion of this court, *Johnson v. Studyvin*, 828 F.Supp. 877, 883 (D.Kan.1993). In *Johnson*, a drywall contractor installed asbestos-containing ceiling texturing materials in the homeowners' house. *Id.* In determining whether there was property damage at the point that the ceiling materials were installed, this court concluded that "at the moment when a defective product, such as a ceiling texture which is hazardous because it contains asbestos, is attached to some property in a manner that makes it not easily removed, that property is physically injured." *Id.*

This court's decision in *Johnson* relied on the Seventh Circuit case of *Eljer Mfg., Inc. v. Liberty Mut. Ins. Co.*, 972 F.2d 805 (7th Cir.1992), *cert. denied,* 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 267 (1993). In *Eljer*, the Seventh Circuit was presented with a federal diversity action in which the insured brought a declaratory judgment action against the primary liability insurers requesting a declaration of whether and when "property damage" coverage under the policies was triggered with respect to underlying claims for a defective plumbing system installed in a house. *Id.* at 807. Applying Illinois law, a divided panel of the Seventh Circuit held that "physical injury to tangible property" occurred at

the time the plumbing system was installed. *Id.* at 814.

After reviewing subsequent cases discussing the "incorporation theory," the court believes that the lone context where that theory is still viable is the asbestos cases; the broader principle espoused in *Eljer* has been rejected. *See, e.g., Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 266 F.3d 859, 862 (8th Cir.2001) (explaining that, with one notable exception (*Eljer*), courts applying the post–1973 definition of "property damage in the standard CGL policy [3] have held that the mere incorporation of a defective component is not 'property damage' because it does not result in 'property damage' "). In fact, in *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill.2d 278, 258 Ill.Dec. 792, 757 N.E.2d 481 (2001), the Illinois Supreme Court expressly rejected the reasoning in *Eljer. Id.* at 497. The court explained that "under its plain and ordinary meaning, the term 'physical injury to tangible property' unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." *Id.* at 502. Based on that definition, the court rejected the argument that the very installation of a functional plumbing system into a structure constitutes "property damage." *Id.*

The court in *Traveler's Ins. Co.* distinguished one of its previous cases involving the installation of asbestos contaminated materials, *U.S. Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991), from *Eljer. Id.* at 498. The court reasoned

---

**3.** The CGL policy was developed by a nationwide industry service organization to provide standard coverage definitions, conditions and exclusions while permitting the parties to tailor the policy terms, such as the type and amounts of coverage, to fit their needs. The CGL policy is widely (if not universally) used by insurers. Prior to 1973, the definition of

"property damage" in the standard CGL policy was "injury to or destruction of tangible property." In 1973, the definition was changed to "physical injury to or destruction of tangible property," the language used in the policy in Esicorp and the Umbrella policy at issue here.

that "the unique nature of asbestos products, which disseminate toxic fibers upon installation and continuously contaminate a structure and its contents subsequent to installation," explains why contamination, which *Wilkin* held constituted the "physical injury" to the property, occurs when the toxic substances are installed. *Id.* Based on that reasoning, the court limited the holding in *Wilkin*, explaining that it "was premised upon the specific facts before the court in that case and not upon a general proposition that incorporation of a defective component into another structure constitutes 'physical injury.'" *Id.* In sum, based on these subsequent opinions, the court believes that the "incorporation theory" has been limited to the asbestos line of cases, such as *Johnson*.

### B. Relevant Framework for Determining What is Covered Property Damage

Although neither party cited to it, the court finds the Eighth Circuit's decision in *Esicorp II*,[4] 266 F.3d 859, instructive for determining how the Kansas Supreme Court would determine what property has been physically injured. In that case, the insured's assignee brought a lawsuit against the defendant for breach of the duty to defend the insured under a CGL policy issued by defendant. *Id.* at 861. In the underlying action against the insured, a third party brought a claim for losses arising out of the need to repair defective pipe welds, which were incorporated into a pipe system, that the insured's testing failed to discover. *Id.* In *Esicorp II*, the Eighth Circuit was faced with deciding what portion of the damages claimed by the plaintiff were covered under the CGL policy. *Id.* In addressing the issue, the

court determined that it hinged on the phrases " 'damages' . . . because of 'property damage'" and "physical injury to tangible property." *Id.* at 862. The court stated: "It is significant that the defectively welded pipe sections did not collapse or burst or otherwise cause accidental injury to surrounding property as a result of [the insured's] negligent inspection." *Id.* Despite the lack of bursting pipes, the insured relied on the incorporation theory set out in Eljer, arguing that "the incorporation of the defectively welded pipe sections into the partially completed pipe system was covered property damage, and therefore all direct and consequential costs resulting from that damage are covered losses." *Id.* After analyzing the issue, the Eighth Circuit disagreed.

The court determined that the Missouri Supreme Court would reject the incorporation theory; therefore, it concluded that merely integrating defective pipe into a partially completed pipe system was not property damage. Id. It explained that the current definition of "property damage" requires some "physical injury to tangible property." Although the court never defined "physical injury to tangible property," it nevertheless excluded the majority of the plaintiff's losses, including all of the repairs to the shop welds, because the court concluded that the property was not physically injured. Id. The limited damages the plaintiff was permitted to recover, which the insurer conceded were covered damages, included the expenses resulting from injury to the epoxy coating, neoprene seal, rebars, and concrete forms caused by repairing the defective welds at the job site after they had been incorporated into the pipe system.

---

**4.** The case reached the Eighth Circuit twice. Thus, the two cases are referred to as Esicorp I and II. The court refers only to Esicorp II here. In Esicorp I, the Eighth Circuit upheld the district court's determination that the insurer breached its duty to defend but remand-

ed the case for an apportionment of the damage amount between covered and uncovered losses. After the district court concluded that all of the losses were covered, the case was again appealed to the Eighth Circuit.

Id. In other words, the court concluded that some of the expenses "were direct and consequential repair costs, which were not covered property damage," while other expenses "were direct and consequential costs resulting from the limited damages [the insurer] concedes were covered." Id. at 864.

The facts here are distinguishable from Esicorp II in that some of the walls constructed by National did crack; the analysis, however, is the same. National's total damages must be apportioned between the direct and consequential repair costs that were the result of covered property damage and those that were not. In order to make that determination, the court must first determine how the Kansas Supreme Court would define "physical injury to tangible property."

### Defining Physical Injury to Tangible Property Under Kansas Law

■ The phrase "physical injury to tangible property" is not defined in the Umbrella policy and, because Hartford did not argue that the damage to the property did not constitute physical injury, the court did not define it in the February 27, 2002, Memorandum and Order.[5] Nonetheless, as the court believes that the terms are unambiguous, it concludes that the Kansas Supreme Court would apply "the natural and ordinary meaning they convey to the ordinary mind." *Harmon v. Safeco Ins. Co. of America*, 24 Kan.App.2d 810, 954 P.2d 7, 9 (1998) (explaining that terms in an insurance policy are generally given such meaning) (citing *Kendall Plumbing, Inc. v. St. Paul Mercury Ins. Co.*, 189 Kan. 528, 370 P.2d 396 (1962)). In *Traveler's Ins. Co.*, the Illinois Supreme Court stated that "under its plain and ordinary meaning, the term 'physical injury to tangible property' unambiguously connotes damage to tangi-

ble property causing an alteration in appearance, shape, color or in other material dimension." 258 Ill.Dec. 792, 757 N.E.2d at 502. The court believes that the Kansas Supreme Court would reach a similar conclusion and, therefore, adopts that definition.

### Apportioning the Damages

Having defined "physical injury to tangible property," the court must now make additional findings of fact to determine what portion of the damage to the project falls within that definition. Certainly the cracked walls, cracked and broken blocks, cracked control joints, cracked mortar joints, cracked concrete floor slabs and cracked lintels constitute property damage. There was significant testimony, however, about other problems at the project that did not result in physically injured property. As the court explained above in the Findings of Fact, Tracy Haley testified about the extensive masonry problems. She explained that many, if not most, of the walls had discontinuous rebar; the rebar was not tied together going up the wall. According to her, the gaps in the rebar caused the walls to be susceptible to cracking in the future. Much of the damage to the project, therefore, is analogous to the plumbing system in Traveler's Ins. Co. (where the evidence established that many of the plumbing systems would eventually cause leaking), in the sense that Ms. Haley's testimony established that it was very likely that cracks would develop in the future, and with the situation in Esicorp II (where the Eighth Circuit explained that it was significant that the pipes had not yet burst), in the sense that most of the walls had not yet cracked. Thus, much like those two cases, the lack of physical injury here means that recov-

---

5. Instead, Hartford argued that the physical injury cannot be to tangible property that is the work product of the insured. The court

rejected that argument in finding that there was property damage.

ery is not appropriate for the type of damage where actual physical injury in the form of cracked walls is likely to occur in the future but has not yet become manifest.

Therefore, while the court believes that in carrying out its performance bond responsibilities F & D may have made a good business decision to tear down and rebuild the project before other problems arose (including some that likely would not have been covered by insurance) and additional expenses had to be incurred to fix those problems, this does not mean that F & D should be permitted to recover from Hartford all of its expenditures.

As explained above briefly in the Findings of Fact, the court is convinced, based upon the expert reports submitted and the testimony at trial, that F & D made the decision to tear down the building based upon many problems that had not yet developed as property damage, especially poor masonry work that had not yet led to cracked walls. The court is not persuaded that it would have been necessary to tear down Areas B and C of the project and substantially rebuild Area A merely to deal with the problems that had actually resulted in property damage. Ms. Haley's testimony that F & D initially believed that fixing the school would be possible supports this position. The court infers from her testimony that on the surface the cracking was not so substantial that repair was out of the question. Ms. Haley went on to explain, however, that once F & D set up the mockup room and began to cut into the walls, it discovered that many, if not most, of the walls had gaps in the rebar or lacked grout such that they would need to be fixed to prevent future cracking. Put another way, it was only after digging below the surface and looking at walls that had not yet cracked that

F & D determined that the damage was not repairable. Mr. Davis's testimony adds further support to this conclusion. He testified that he believed that repair was possible but conceded that F & D had more facts based on the mockup room. The court infers from this testimony that Mr. Davis believed that fixing the existing cracks was feasible.

Having concluded as a factual matter that tearing down the project was a business decision made by F & D that was not necessitated by the physical injury to the project, the court is left to determine the appropriate amount of damages caused by the property damage. The measure of the damages is what it would have cost to fix the cracks and other physically injured property at the project. *Flom v. Stahly*, 569 N.W.2d 135, 139 (Iowa 1997) ("When the loss in value to the injured party cannot be proved with sufficient certainty, a breach resulting in defective construction may entitle the injured party to recover damages based on 'the reasonable cost of ... remedying the defects if that cost is not clearly disproportionate to the probable loss in value ....'") (quoting Restatement (Second) of Contracts § 348(2)(b) (1979)); cf. *Nolan v. Auto Transporters*, 226 Kan. 176, 597 P.2d 614, 621 (1979) (stating general rule in Kansas that when repairs can restore damaged personal property to its previous condition, the measure of damages is the fair and reasonable cost of the repairs...including a reasonable sum to compensate for loss of use of the personal property while being repaired...not to exceed the value of the property before the damage) (citing PIK–Civil 2d 9.10 (1977) (further citations omitted)); see also *Esicorp II*, 266 F.3d at 864 (limiting insured's award to the amount it would cost to repair the covered property damage).[6]

6. Under the language of the Umbrella policy, property damage includes loss of use of the

The court notes that the evidence before the court on this issue is sparse and, consequently, it is extremely difficult to compute an exact figure of what it would have cost to fix the physically injured property. F & D chose to argue at trial that the entire cost of replacing the project should be placed on Hartford; therefore, F & D's damage estimates do not attempt to distinguish between what the court has determined is covered property damage and other damage. Similarly, Hartford did not provide the court with an estimate of the covered property damage; instead, Hartford urged the court to look at engineering reports by, among others, WJE, which document that the project was not structurally sound and that it did not meet the contract specifications. These reports, however, are not focused on answering the question of how much physical damage actually was present.

Nonetheless, the Tenth Circuit has explained that all that is required of the district court "is a reasonable basis for computation and reliance on the best evidence available in the circumstances." *Lone Mountain Prod. Co. v. Natural Gas Pipeline Co. of America*, 984 F.2d 1551, 1558 (10th Cir.1992); *Furr v. AT & T Tech., Inc.*, 824 F.2d 1537, 1548 (10th Cir.

1987). Moreover, in *United States Naval Inst. v. Charter Communications, Inc.*, 936 F.2d 692 (2d Cir.1991), the Second Circuit explained that when the evidence is lacking and the court must hypothesize on what the damages would have been, "it is not error to lay the normal uncertainty in such hypotheses at the door of the wrongdoer who altered the proper course of events, instead of at the door of the injured party." *Id.* at 697. In other words, here, although the record is lacking in evidence of what the precise expenses would have been had the physically injured property been repaired, such evidence necessarily would have been hypothetical anyway; therefore, it is not error if the court's determination of the damages F & D sustained is less than one hundred percent accurate so long as it is a reasonable result based on the best evidence available.

■ With those principles in mind, the court concludes a damage figure of $1,000,000 to repair the project's physically injured property is appropriate. Put another way, the court concludes that National's 'damages' ... because of ... 'property damage' ...." total $1,000,000." The starting point for the court's calculation is Clay Davis's testimony that he believed as late as March of 1999 that Areas B and C of the project[7] could be fixed to

---

tangible property that is physically injured. Mr. Quatman testified that a portion of National's settlement with the School District was for the School District's claim for loss of use of the building because it was nearly two years late being completed. The testimony at trial also established that a portion of National's settlement with F & D was for liquidated damages F & D was forced to pay the School District because the school was late being built. Nonetheless, having found that the property damage did not necessitate the tear down, the court concludes that no damages should be awarded for the loss of use of the building. There was no evidence that absent the tear down, the delay caused by repairing the project would have caused the damages to occur. In short, F & D failed to show that there would have been any loss of use dam-

ages caused by a delay attributable to physically injured property.

F & D also makes a claim for $20,876.10 National incurred for engineering and testing fees. Mr. Davis testified at trial that these fees were for engineers that were hired "to do testing to determine the nature and extent of the defects that were being claimed." The court concludes that these fees are also not properly recoverable. F & D failed to show that these tests related to testing of covered property damage to the project.

7. Mr. Davis testified at trial that Areas B and C comprised of 50,000 of the project's 85,000 square feet. The trial testimony also established that the problems with Areas B and C were more severe than those with Area A, the other area of the project.

meet the contract specifications, which would include both work which caused property damage and work which was otherwise defective, for $1,050,000.[8]

By contrast, in March of 1999 F & D thought the number was more like $2,500,000 to $3,000,000. These figures likely bracket the actual covered loss here.

Clay Davis conceded that he was not at the project on a full-time basis, that F & D had more facts based on the mockup room and that he believes that given the new information from the mockup room, his number was probably low as to the cost to bring the project up to specification. The court infers from this testimony and the other evidence at trial that F & D's figure for how much it would have cost to fix the project to meet the contract specifications is higher because F & D opened up the walls in the mockup room that were not cracked and discovered that there were gaps in the rebar in those walls as well. In other words, Mr. Davis's estimate, which was based on what he saw at the project when he visited it, is likely closer to the amount that it would have cost to fix the physically injured property, while F & D's estimate, which is based on extensive testing in the mockup room, is likely closer to the amount it would have cost to bring the project up to the contract specifications. Thus, the court believes that Mr. Davis's estimate may well have been too low for estimating how much it would have cost to bring the project in line with the contract specifications; however, it provides the basis for an accurate estimate of how much it would have cost to fix the physically injured property.

The evidence in the record supports the court's finding. One of the reports in the record, referred to as the "crack report," compiled by DLR, an engineering firm, for the School District provides a summary of the cracks in the walls at the project during an inspection on January 15, 1999. The report indicates that 61 out of 85, or 72%, of the rooms had a crack in at least one wall. However, only 42% of the rooms had cracks in more than one wall, only 4% of the rooms had cracks in all four walls and only 21% of the cracks were major or large. The report did indicate that the cracks were getting worse. In contrast, the reports from WJE to Dr. Stanage, documenting inspections of the project as early as October of 1998 and as late as the end of April of 1999, refer to cracking periodically throughout the discussion of the problems with the project but did not give the court the impression that the cracking and other physically injured property was the exclusive problem with the project.

In sum, the court believes that the reports and testimony at trial documented a situation where cracking existed but did not persist throughout each wall of the project. Also, an overwhelming majority of the cracking that did exist did not appear to be major. Based on these findings, the court believes that the cracking and other physically injured property could have been fixed at the time for a substantially lower amount than it cost to tear down and rebuild a substantial portion of the project. The court must then consider whether Mr. Davis's figures should be adjusted, either upward or downward, to more accurately reflect the actual damages. On the one hand, Mr. Davis's figure is likely higher than the actual covered loss because it undoubtably included out of specification work which had not yet resulted in physical damage to the property. On the other hand, his estimate does not take into account further

---

**8.** Mr. Davis's initial calculations were done sometime prior to March of 1999, however, he testified on cross-examination that he still believed in March of 1999 that his estimate was correct.

cracking which more likely than not occurred after he gave his estimate or the fact that his estimate included only the cost to repair Areas B and C. While it is far from certain that these adjustments would mathematically counterbalance, given the evidence at hand the court believes that viewing them in that fashion is the most reasonable basis to arrive at a fair result here and leads the court to its ultimate conclusion that the 'damages' (to the project) ... because of ... 'property damage' ...." were in an amount of $1,000,000".

### Arguments For Further Reducing the Damages

■■ At trial, Hartford made two additional arguments in an attempt to reduce F & D's damages. First, Hartford argued that it was not given written notice of the claim against its insured, National, until September of 1999, and by that point in time the project was already torn down. F & D contends that Hartford waived the issue by not preserving it in the pretrial order. Moreover, according to F & D, the argument fails on its merits because Hartford is unable to show any prejudice to it by the lack of notice. The court agrees with F & D that to the extent that Hartford is attempting to deny liability due to the lack of notice, the issue has been waived. Hartford did not raise the issue in the pretrial order. *Rios v. Bigler*, 67 F.3d 1543, 1549 (10th Cir.1995) (holding that the district court has discretion to exclude from trial issues not raised in the

pretrial order); see also *Henry v. Johnson*, 191 Kan. 369, 381 P.2d 538, 543 (1963) (noting that under Kansas law a failure to give timely notice under an insurance policy must be pleaded and proved by the party asserting it). The court also is not persuaded that F & D's damages should be reduced by the fact that Hartford did not receive written notice of the occurrence until early September of 1999. The evidence at trial established that National gave Hartford's agent oral notice immediately after the school district raised concerns; therefore, Hartford had actual notice of the claim and cannot now contend that it was prejudiced by the late notice. *Henry*, 381 P.2d at 546 (reasoning that where an insurer had actual knowledge of accident and consequently an opportunity to defend, the failure to give notice or forward pleadings will not preclude recovery under the policy); see also, *Dyer v. Holland*, 1997 WL 807866, at *8 (D.Kan. Dec. 9, 1997) (holding the same) (citing *Henry v. Johnson*, 381 P.2d at 546). Moreover, after receiving notice and investigating the circumstances, Hartford denied that coverage existed. Thus, it cannot now contend that it was substantially prejudiced by the lack of notice. *ERA Franchise Systems, Inc. v. Northern Ins. Co. of New York*, 32 F.Supp.2d 1254, 1257 (D.Kan.1998) (stating that under Kansas law an insurer must show substantial prejudice from the lack of notice before it may be relieved of liability) (citing *Hunt v. Kling Motor Co.*, 841 F.Supp. 1098, 1101 (D.Kan.1993)).[9]

---

9. The court also rejects the contention that Hartford is not responsible for National's attorneys' fees prior to being given notice of a claim. In *TPLC, Inc. v. United National Ins. Co.*, 44 F.3d 1484 (10th Cir.1995), the Tenth Circuit, applying Pennsylvania law, held that the insurer must show prejudice from the lack of notice in order to limit the attorneys' fees the insured may recover, even when the expenses are incurred prior to the insurer's receipt of notice of the claim. *Id.* at 1494.

The Kansas Supreme Court has not addressed the issue; however, the court believes that the Kansas Supreme Court's prejudice requirement makes TPLC particularly persuasive. Similar to the insurer in TPLC, here Hartford has not shown any prejudice from the lack of notice. Specifically, Hartford has not persuaded the court that it would not have had to expend the time and effort to familiarize itself with the case had it undertaken its duty to defend National, thus incurring fees at least

As a second means of reducing the damages, Hartford argued at trial that National ignored the School District's order, issued July 21, 1998, to stop working on the project. According to Hartford, a substantial amount of work was done on the project between July of 1998, when the alleged stop work order was issued, and October of 1998, when National's contract was eventually terminated. Some of this work included physical damage which was covered under the Umbrella policy; therefore, according to Hartford, it should not be liable for the expenses relating to the additional work because National should have stopped working when it was ordered to do so. The court does not believe that the evidence at trial supports such a finding. Clay Davis testified that he did not consider the July 21, 1998 letter to be a stop work order. Moreover, he explained that the day after he received the letter, a representative from National sent a letter to the School District explaining that the damage was not as bad as initially thought, and, thereafter, the school continued to pay National for the pay applications it submitted. Given this testimony, the court does not believe that National continued to perform work against the school's will; even if the initial letter from the school was intended to be a stop work order, requiring National to stop working, the School District's actions, particularly in paying some of National's pay applications, clearly indicate that it withdrew or revoked the order to stop work. Therefore, F & D's damages should not be reduced because National allegedly did not comply with the supposed stop work order letter.

## C. Attorneys' Fees Incurred in the Underlying Litigation

F & D seeks to recover $739,272.12 for National's attorneys' fees, $51,197.01

for Midwest Drywall's attorneys' fees and $1,226,382.79 for its attorneys' fees. Hartford opposes each of F & D's requests. First, Hartford urges the court to reduce National's attorneys' fees because a portion of the fees relate to the lawsuit brought by F & D and to cross-claims National filed against other defendants, and because National's attorney charged an unreasonable rate. Second, Hartford contends that Midwest Drywall's attorneys' fees should not be recoverable because it was never given notice of F & D's lawsuit against Midwest Drywall. Finally, Hartford alleges that F & D did not include a claim for its attorneys' fees in the pretrial order; therefore, according to Hartford, the fees are not recoverable.

### 1. Findings of Fact

At trial, it was established that between June of 1999 and December of 2001, National paid Shughart Thomson & Kilroy $739,272.10 in attorneys' fees for its defense in the underlying state cases. Specifically, the evidence and testimony established that National incurred the following attorneys' fees: $648,428.39 for its defense of the lawsuit against the School District; $11,928.43 for the National Hartford coverage dispute; $1,067.50 for a cross-claim against Northwest Arkansas in the School District case; $2,419.30 for a cross-claim against R.C. Professional in the School District case; $12,144.60 for a cross-claim against DLR in the School District case; $2,690.50 for a cross-claim against GSI in the School District case; $2,139.41 for a cross-claim against Wayne Coleman in the School District case; and $58,453.99 for the lawsuit against F & D. Mr. Quatman of Shughart Thomson & Kilroy handled the case for National and testified that he charged an hourly rate of $205 to $250.

equal to those claimed by F & D here for the period before written notice was given. Consequently, the court concludes that National's

attorneys' fees should not be limited due to the notice requirement.

The evidence and testimony also established that during the same period, Midwest Drywall paid Balkin & Witten $51,197.01 in attorneys' fees for its defense in the underlying state and federal cases against F & D, and F & D incurred $1,226,382.79 in attorneys' fees in the underlying state case, and for related mediation costs and other costs of defense, paid to Debra Arnett, Gilliland & Hayes P.C., Steptoe & Johnson, Spencer Fane Britt & Browne LLP, mediators and expert witnesses.

Keith Witten of Balkin & Witten testified at trial that he charged an hourly rate of $150 and his partner, Bernard Balkin charged an hourly rate of $175. Carol Smith of Gilliland & Hayes testified at trial that she charged an hourly rate of $130 to $140 and Bruce Waugh, a partner with her firm, charged an hourly rate of $160 to $175. She testified that the agreed rates were negotiated in exchange for doing all of F & D's work.

At trial, Hartford challenged only Mr. Quatman's hourly rate of $205 to $250; it did not challenge the way in which the attorneys' fees and expenses were calculated by F & D. An attorneys' fee award for defending the underlying litigation is "based on the standard of reasonableness which exists in the community." *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 512 P.2d 403, 409 (1973). The court was persuaded by the testimony of each of the lawyers and, in the absence of any evidence to the contrary, concludes that the amount of attorneys' fees and expenses was reasonable. Specifically, the court was persuaded that Mr. Quatman's hourly rate of $205 to $250 was justified. Mr. Quatman testified that he has been practicing law since 1984 and is now a partner and shareholder of Shughart Thomson. He testified that he spent his first five years with a small boutique construction litigation firm and has since

been with Shughart Thomson. He also testified that he is a licensed architect in the state of Missouri. Based on his testimony, it is evident to the court that Mr. Quatman's expertise is in construction litigation. Of the three attorneys who testified, only Mr. Quatman's credentials indicated that he had specialized expertise in construction litigation. Moreover, Mr. Witten testified that his law firm could not have handled such a matter alone due to the resources needed to handle the case. It is based on Mr. Quatman's expertise and the resources that his firm brought to the case that the court concludes that his hourly rates were reasonable.

F & D also provided evidence to establish that it has incurred $104,010.78 in attorneys' fees paid to Spencer Fane Britt & Browne LLP for prosecuting this action. F & D also incurred $15,130.59 in expert and attorneys' fees paid to Faegre & Benson for Patrick O'Connor's services as an expert witness and as an attorney not appearing in the case. At trial, Hartford stipulated as to the accuracy of the attorneys' fees which Spencer Fane alleged in its papers it has incurred.

## 2. Conclusions of Law

Although the court believes the fees were reasonable, the court is persuaded by Hartford's argument that a portion of National's fees relate to litigation involving F & D and which is not covered. The court is persuaded that all of the fees incurred by National would have been incurred by Hartford had they fulfilled their duty under the policy and defended National with the exception of the $58,453.99 incurred in defending the lawsuit brought by F & D relating to the indemnification agreement. Had Hartford defended National in the underlying lawsuit by the school district, it would have been incumbent upon Hartford to file the cross-claims against the other subcontractors in an attempt to reduce National's damages. See,

e.g., *Aerosafe Intern., Inc. v. ITT Hartford Midwest*, 1993 WL 299372, at *5 (N.D.Cal. 1993) (permitting recovery of attorneys' fees for preparation of cross claims where insurer failed to provide a defense thereby giving up the right to control the litigation). Therefore, the court finds that these attorneys' fees are recoverable. The attorneys' fees stemming from the lawsuit brought by F & D are different, however. The Umbrella policy explains that Hartford will defend the insured in any lawsuit seeking damages on account of property damage. F & D did not sue National seeking damages on account of property damage it sustained; instead, F & D sued National seeking to enforce its rights under the indemnification agreement. Although F & D sought to recover money that, in part, happened to be for expenses incurred by it on property damage, F & D, itself, did not suffer any property damage. In sum, the court concludes that F & D's attorneys' fees totaling $58,453.99 are not recoverable, and National's remaining attorneys' fees that are recoverable total $680,818.13.

■ The court is also persuaded by Hartford's argument that Midwest Drywall's attorneys' fees are not recoverable. Midwest Drywall was not sued by the School District in the underlying litigation.[10] Midwest Drywall became involved in the case only after F & D sued it in state court and then later filed a federal lawsuit against it seeking identical damages for Midwest Drywall's obligations un-

der the indemnification agreement. As the court explained above with regard to National's involvement in that lawsuit, the court does not believe that Hartford had a duty to defend Midwest Drywall under the Umbrella policy because F & D sued Midwest Drywall not because of property damage to it but to enforce the indemnification agreement. In fact, Midwest Drywall's situation illustrates the point the court made above. At the time that Midwest Drywall was sued, it had not taken part in any of the construction at the project. It was sued solely in its capacity as an indemnitor on the performance bond. Therefore, it could not have been sued because of property damage caused by any of its work. Based on this reasoning, the court concludes that Midwest Drywall's attorneys' fees are not properly recoverable.

■ Finally, the court must address F & D's argument that it is entitled to recover its attorneys' fees. The court finds the argument unpersuasive. In support of its position at trial, F & D cited to the case of *Merrick Const. Co. v. Hartford Fire Ins. Co.*, 449 So.2d 85 (La.Ct.App.1984), in which the court held that the insurer was responsible not only for the defense of its insured contractor, but for the defense costs of the surety, due to the indemnity obligation between the principal (who was also the insured) and surety. *Id.* at 88. In *Merrick*, a contractor sued its general liability insurer to recover, in part, attorneys' fees paid for defending its surety against a third party demand in a negli-

---

**10.** When F & D moved for summary judgment, it argued that Hartford had a duty to defend both National and Midwest Drywall. In its response, Hartford did not delineate between the lawsuit by the School District and the lawsuit by F & D and, therefore, the court's February 27, 2002, Memorandum and Order, treated Hartford's duty to defend as if National and Midwest Drywall were both sued by the School District. At trial, Mr. Witten testified that he did not think he gave

Hartford notice of F & D's lawsuit against it. As Hartford did not previously make that argument, the court considers it waived. Nonetheless, the court does not believe that the duty to defend pursuant to the Umbrella policy would extend to F & D's lawsuit against National and Midwest Drywall. Therefore, to the extent that the court's previous order is inconsistent with that pronouncement, it is hereby amended to conform to the court's current finding.

gence action. *Id.* at 87. In the underlying litigation, a third-party sued, among others, the insured and the owner, for whom the insured did the work, claiming the insured was negligent in the performance of road work. *Id.* The owner, in turn, brought a third-party demand against the insured's surety who had executed a performance bond to guarantee the insured's work. *Id.* The surety tendered the defense to the insured who, in turn, tendered it to Hartford. *Id.* Hartford refused to defend the surety since it was not a named insured under Hartford's policy. Id. After the case was settled, the insured sued its insurer not because it believed its insurer should have defended the surety but to recover the cost of defending its surety against the third-party demand. *Id.* Upholding the trial court, the Louisiana Court of Appeals held:

> Undoubtably, [the insured] warranted its work would be done in a workman-like manner. Whatever liability [the owner] would incur under the relationship with [the insured] would arise from a breach of that warranty for which [the insured] and [the surety] would be responsible. The liability of [the insured] to [the surety] arises not just from the guaranty but from the legal provisions governing suretyship, and the general purpose of liability insurance is to cover this type of legal liability. We find that [the insured] was responsible and that the general liability provisions covered this type of risk. The fact that [the surety] is a stranger to the policy is irrelevant; it is the liability of [the insured] that [the insurer] insured and was required to defend.

*Id.* at 88.

*Merrick*, therefore, stands for the proposition that the insurer has a duty to indem-

nify its insured for the expenses incurred by the insured to defend its surety if the expenses are covered by the general liability policy. The duty to indemnify runs only to the insured and only for the insured's damages that fall under the general liability policy. Implicit in the court's reasoning in Merrick is the notion that the insured must actually pay for the surety's legal fees; otherwise, the insured has not suffered the requisite damage to trigger coverage under the policy.

The court does not reach a conclusion as to whether the Kansas Supreme Court would adopt the reasoning in Merrick because the case is distinguishable from the circumstances here on the facts. Specifically, it is the fact that in Merrick the insured actually paid the surety's legal fees that distinguishes it from the circumstances here. F & D did not allege that National paid for its attorneys' fees, and the parties' settlement agreement confirms that conclusion. The release section of the settlement agreement states in relevant part:

> National and the Indemnitors acknowledge they are responsible for (and not released from) paying F & D's past and future attorneys' fees, costs and litigation expenses which have been incurred as a result of issuing the Bonds. F & D agrees that it will accept in full satisfaction of National's and the Indemnitor's obligation to pay F & D's attorneys' fees, costs, and litigation expenses only those amounts recovered under Hartford's policies, as set forth in ¶ 5 below.

Having found that National did not pay F & D's attorneys' fees, National sustained no damages.[11] Thus, none of F & D's

---

11. The operative language of the Umbrella policy's insuring clause states: "[Hartford] will pay those sums that [National and Mid- west Drywall] must legally pay as 'damages' ... because of ... 'property damage' ... caused by an 'occurrence.' "

attorneys' fees from the underlying litigation are recoverable.

### D. Recovery of Attorneys' Fees Under K.S.A. § 40–256

■ F & D also makes a claim in the amount of $127,398.60, pursuant to K.S.A. § 40–256, for its attorneys' fees, including the fees of its experts, incurred in bringing this action against Hartford. K.S.A. § 40–256 provides in pertinent part:

> That in all actions hereafter commenced, in which judgment is rendered against any insurance company . . . if it appears from the evidence that such company . . . has refused without just cause or excuse to pay the full amount of such loss, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such action, including proceeding upon appeal, to be covered and collected as a part of the costs. . . .

*K.S.A. § 40–256.*

■ This court, as the trier of fact, must determine whether the insurer has refused without just cause or excuse to pay the full amount of the insured's loss. *Koch v. Prudential Ins. Co. Of America,* 205 Kan. 561, 470 P.2d 756, Syl. ¶ 1 (1970). Under Kansas law, it is undisputed that "the accepted test for determining the existence of 'just cause or excuse' for purposes of § 256 is whether the insurance company's refusal is based on a bona fide controversy over policy coverage." *Glickman, Inc. v. Home Ins. Co.,* 86 F.3d 997, 1002 (10th Cir.1996) (citations omitted). "Bona fide controversy has been further defined to mean a position which is not frivolous or patently without reasonable foundation." *Id.* (citations omitted). In Glicksman, the Tenth Circuit held that the test is the same regardless of whether the plaintiff's claim is for breach of the duty to indemnify or breach of the duty to defend. *Id.* The court explained that although the duty to defend is broader than the duty to

indemnify because it is triggered when there is a potential of liability, "under the plain language of § 256 there is no separate and stricter standard for refusals to defend." *Id.*

F & D argues that Hartford refused to pay without just cause or excuse because it failed to conduct a good faith investigation of the claim in accordance with the statute. Specifically, F & D argues that Hartford could not have conducted a good faith investigation because it did not consider whether the Umbrella policy it issued would provide coverage. The Kansas Supreme Court has held that an insurer has "an obligation to conduct a good faith investigation into the facts before it finally denies liability and refuses payment." *Brown v. Continental Cas. Co.,* 209 Kan. 632, 498 P.2d 26, Syl. ¶ 6 (1972). The court concludes that the record indicates that Hartford adequately investigated the facts surrounding this case before denying coverage. Hartford's initial letter described in detail the reasons that it was denying coverage and the case law supporting those reasons. Specifically, Hartford explained that it did not believe that there had been an occurrence that caused property damage and, alternatively, the policy exclusions would apply to exclude coverage. Such detail gives rise to the inference that Hartford thoroughly investigated the claim and did not just deny it out of hand. Moreover, Hartford's follow-up letter reiterated that coverage would be denied because, in Hartford's opinion, under Kansas law the damage to the project was not caused by an "occurrence." This is not a situation in which Hartford refused to consider facts which were presented to it or blatantly neglected to ascertain what the circumstances actually were before deciding that coverage did not exist. It looked into the situation in good faith and arrived at a conclusion that coverage did not exist which, though not the conclu-

sion at which this court arrived, was not one arrived at without just cause or excuse. See *United Wats, Inc. v. Cincinnati Ins. Co.*, 971 F.Supp. 1375, 1387 (D.Kan. 1997) (holding that insurers review of insured's claim was not "of sufficient bad faith to warrant an award of attorneys' fees").

F & D also argued at trial that Hartford did not have just cause or excuse for declining to defend National because Courtney Koger, the attorney Hartford initially hired to handle the case, advised Hartford that it should defend the lawsuit. The court cannot agree with F & D's position. Ms. Koger's conclusion that Hartford should defend the lawsuit was based on the duty to defend standard of whether there was potential for liability. The court reached a similar conclusion under that standard in the February 27, 2002, Memorandum and Order. Here, however, the standard is whether Hartford's reasons for denying coverage of National's claims were frivolous or patently without reasonable foundation. Under this standard, the court concludes that Hartford's reasons were not frivolous or patently without reasonable foundation.

Hartford believed that National's faulty workmanship was not covered by the policies it issued for two reasons: first, because the damage to the project was not property damage caused by an occurrence; and second, because the policy exclusions applied to exclude coverage. Although the court ultimately disagreed with both of these reasons, they certainly were not frivolous or patently unreasonable at the time Hartford denied coverage. As the court explained in the February 27, 2002, Memorandum and Order, with regard to whether there was an occurrence, there is a split

among the courts that have decided the issue. While this court believes that the Kansas Supreme Court would follow what this court considers to be the better reasoned interpretation, see, e.g., Clifford J. Shapiro, Point/Counterpoint: Inadvertent Construction Defects are an "Occurrence" under CGL policies, 22 SPG Construction Law 13, 13 (Spring 2002) (explaining "that the better-reasoned decisions recognize that there is an 'accident,' and therefore an 'occurrence,' when construction work inadvertently is not performed as promised and property damage occurs that is neither expected nor intended"), Hartford had every right to test the law in Kansas on this subject.

The court is also aware that in most construction disputes such as this, the policy exclusions contained in a standard CGL policy would place the damage to the project outside of coverage. Thus, it would be understandable for Hartford initially to conclude that the damage to the project caused by National's faulty workmanship would fall outside the coverage of its policies. It was only under the unique circumstances that eventually unfolded during the course of this litigation, the Umbrella policy dropped down to provide coverage, it did not contain all of the business risk policy exclusions and, significantly, Hartford waived several policy exclusions by not including them in the pretrial order,[12] that the court was led to conclude that the Umbrella policy covered the damage to the project. In sum, given the unique circumstances of this case, the court does not believes that Hartford took a frivolous or patently unreasonable position at the time that it denied coverage. Accordingly, at-

---

12. The court reiterates that its decision to preclude Hartford from relying on policy exclusions not contained in the pretrial order rested on the strong federal policy to require

both parties to fully disclose their positions so that it is clear before trial what issues will be in the case. *Rios,* 67 F.3d at 1549 (internal quotations and citation omitted).

torneys' fees for bringing this action must be denied.

### E. Recovery of Pre-judgment Interest

■ F & D also makes a claim for prejudgment interest pursuant to K.S.A. § 16–201. Hartford contests the conclusion that an award of prejudgment interest is appropriate here. The allowance of prejudgment interest under Kansas law is a matter of judicial discretion. *Miller v. Botwin*, 258 Kan. 108, 899 P.2d 1004, 1011 (1995); *Crawford v. Prudential Ins. Co. of America*, 245 Kan. 724, 783 P.2d 900, 910 (1989). "The general rule in Kansas is that prejudgment interest is allowable on liquidated claims." *Miller*, 899 P.2d at 1012; see also K.S.A. § 16–201 ("Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance . . . ."). "A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation." *Kilner v. State Farm Mut. Auto. Ins. Co.*, 252 Kan. 675, 847 P.2d 1292, 1300 (1993).

Hartford relies on the case of *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 562 P.2d 1 (1977), in which the Kansas Supreme Court, in upholding the trial court's decision to deny prejudgment interest to the plaintiff for inventory and loss of earnings, explained:

> As to the amounts which were determined to be due only when judgment was entered below, we believe the general rule as to unliquidated claims should apply. Apart from the question of liability . . . the amount due if there was liability was not determined until judgment. The [value] was subject to proof at trial by any competent evidence. . . . Such a result, however, could not have been foretold before this litigation was well under way, and until that time the total claim was unliquidated. *Id.* at 15. Hartford argues that like the damages in Lightcap, here F & D's damages could not have been determined until F & D provided evidence at trial to support its claim. The court agrees with regard to the covered property damage National sustained but disagrees as to F & D's claim for National's attorneys' fees.

■ Along with the issue of liability, Hartford has continually contested the amount of damages that F & D has alleged. In fact, until this order deciding the total amount of damages incurred, the amount of damages, including every category of damages that F & D alleged, has been in dispute. This case, therefore, is distinguishable from a case like *Royal College Shop, Inc. v. Northern Ins. Co. of N.Y.*, 895 F.2d 670 (10th Cir.1990), in which the Tenth Circuit upheld an award of prejudgment interest under Kansas law in a dispute between an insurer and insured over liability under an insurance contract where the amount of damage to the building covered by the insurance policy was not in dispute. *Id.* at 675. Moreover, in addition to being disputed, the damages were also unable readily to be calculated. It was only after the court reviewed the evidence and drew conclusions from that evidence that the amount of damages was determined by the court. In sum, the court concludes that until this order, F & D's claim for covered property damage National sustained was unliquidated and, consequently, it is not entitled to recover prejudgment interest.

■ The amount of National's attorneys' fees the court awards here, on the other hand, has never been in dispute. It is irrelevant that liability was disputed, as long as the amount of damages was cer-

tain. *Royal College*, 895 F.2d at 674. Apart from one question on cross-examination, Hartford did not contest the reasonableness or calculation of the attorneys' fees F & D was seeking on behalf of National, and Hartford did not dispute the amount in the pretrial order or any other papers that it filed with the court.

It is not clear from the record, however, the date from which the prejudgment interest should begin to accrue. Specifically, it is unclear from the record the date on which the $680,818.13 for National's attorneys' fees became "fixed and certain" or when it became "definitely ascertainable by mathematical computation." *Kilner*, 847 P.2d at 1300. Accordingly, if F & D wishes to pursue this claim for prejudgment interest on the $680,818.13 in attorneys' fees, then it shall file a motion to amend the court's judgment pursuant to Fed.R.Civ.P. 59(e) within 10 days after entry of judgment. See, e.g., *Centennial Mgmt. Services, Inc. v. Axa Re Vie*, 196 F.R.D. 603, 606 (D.Kan.2000) (holding that a motion for prejudgment interest is construed as a Rule 50(e) motion to amend the judgment) (citing *Capstick v. Allstate Ins. Co.*, 998 F.2d 810, 812–13 (10th Cir.1993), and *Adams–Arapahoe Joint Sch. Dist. No. 28–J v. Continental Ins. Co.*, 891 F.2d 772, 780 (10th Cir.1989)). F & D should note that "[t]his time limit is mandatory and the district court is prohibited from extending it." *Id.* at 607 (citing Fed.R.Civ.P. 6(b), and *Weitz v. Lovelace Health Sys., Inc.*, 214 F.3d 1175, 1179 (10th Cir.2000)).

**IT IS THEREFORE ORDERED BY THE COURT** that F & D be awarded judgment in the amount of $1,680,818.13. Specifically, F & D is entitled to $1,000,000.00 for damages National incurred as a result of property damage to the project and $680,818.13 for attorneys' fees and expenses National incurred in the underlying lawsuit against it. The court further concludes that F & D is not enti-tled to an award of attorneys' fees for expenses incurred in this action.