FILED

February 17 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 14-0342

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 42

TRUCK INSURANCE EXCHANGE,

        Petitioner, Counter Defendant and Appellee,

  v.

DON O'MAILIA, dba LOLO PLUMBING & HEATING,

        Respondent, Counter Plaintiff and Appellant,

and

Diamond Plumbing & Heating, Inc.

        Respondent and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV-13-1031B
Honorable Robert B Allison, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          David J. Steele II, Geiszler & Froines, PC, Missoula, Montana

          Perry J. Schneider, Dylan M. McFarland, Milodragovich, Dale
          & Steinbrenner, P.C., Missoula, Montana
          (*Attorneys for Diamond Plumbing & Heating, Inc.*)

      For Appellee:

          Mark S. Williams, James D. Johnson, Williams Law Firm, P.C., Missoula,
          Montana

                    Submitted on Briefs:  January 7, 2015
                              Decided:  February 17, 2015

Filed:

_____
                    Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     Don O'Mailia d/b/a Lolo Plumbing & Heating (O'Mailia) appeals from orders of the Eleventh Judicial District Court, Flathead County, granting summary judgment in favor of Truck Insurance Exchange (TIE) and dismissing O'Mailia's counterclaims with prejudice.  We affirm.

¶2     O'Mailia presents the following issues for review:

1. *Whether the District Court erred when it granted summary judgment in favor of TIE on the basis that no property damage occurred during the policy period.*

2. *Whether the District Court violated O'Mailia's right to due process when it dismissed his counterclaims with prejudice after granting summary judgment in favor of TIE.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3     In 2007, O'Mailia was hired to install a water heater on the premises of the newly-constructed Famous Dave's barbecue restaurant in Kalispell.  At that time, O'Mailia was covered by a commercial general liability policy provided by TIE, which he held from July 10, 2006 until he elected to terminate the coverage on November 29, 2009.  On March 12, 2010, about three years after the water heater was installed, Famous Dave's opening manager Michael Schindler noticed a burning smell in the mechanical room.  Schindler called the Kalispell Fire Department.  Firefighters turned off the water heater and advised Schindler to have a plumber look at it.  Schindler called Diamond Plumbing & Heating (Diamond).  Diamond employee Clarke Dickey replaced the combustion air fan assembly, but reportedly did not conduct a further examination of the water heater.

2

¶4	The next day, Schindler smelled burning and called Diamond again. Diamond employee Rex Denison examined the water heater and apparently concluded it was working fine, but could not meet hot water demand, possibly because the heat exchanger needed cleaning or because the water heater was too small. Denison measured the external temperature of the exhaust vent at 486 degrees Fahrenheit. He reportedly did not examine or clean the heat exchanger. About an hour after Denison left, a fire broke out and Famous Dave's closing manager, Joey DeLao, called the fire department.

¶5	Multiple experts later examined the premises and determined that the cause of the fire was related to installation and maintenance of the water heater. Frank Hagan prepared a report in which he concluded that the water heater exhaust vent pipe had reached excessive temperatures and ignited nearby wood framing and roofing materials. Hagan concluded the excessive exhaust vent temperatures were caused by a fouled heat exchanger. Hagan observed that the water heater was set to a low output temperature and a low-temperature bypass was not installed, which could have caused excessive soot build-up on the heat exchanger. In a later deposition, Hagan stated that he believed the wood framing near the water heater was likely "pyrolizing" as a result of exposure to excessive temperatures. Hagan explained pyrolysis as follows:

> Well, what happens with wood is that when you expose wood—pyrolizing is a result of the material or the wood degrading due to heat exposure. And what happens when you pyrolize wood, you heat the wood to temperatures below what it would normally ignite at, and over a period of time the wood degrades and will ignite at a temperature much lower than its typical ignition temperature.

3

Hagan went on to say that he believed pyrolysis "[h]ad already been occurring" by the time Diamond first inspected the water heater on March 12, 2010. Hagan explained that pyrolysis was not actual combustion, but rather the process of "thermally degrading the wood or the wood material combustibles." Hagan stated that although wood usually ignites at "approximately 650 degrees," under conditions of pyrolysis, wood could ignite at a significantly lower temperature.

¶6     Another investigator, Chris Rallis, agreed that transference of heat from the water heater exhaust vent appeared to be the cause of ignition. Rallis also referred to pyrolysis, stating:

> Some of the conditions which gave rise to this fire were likely in existence from the time of construction of this structure and became aggravated overtime [sic] as the heat transfer continued to expose the framing member to the repeated cycling of the water heater and flu[e] gas discharge.
>
> Prolonged exposure of heat to a combustible product can cause the ignition temperature to be achieved with greater ease than if it had not occurred.

¶7     Frank Pritzl concluded that the fire was ignited by excessive temperatures within the exhaust vent, which were due to soot build-up in the heat exchanger. Pritzl did not refer to pyrolysis, but concluded, "The fiberboard insulation in this area that was heated to its smoldering combustion temperature was the first fuel for this fire."

¶8     Michael Fitz concluded that the "heat exchanger of the boiler was almost completely blocked by soot," and observed that previous investigators had "reportedly ruled out any other cause of the fire . . . except for the exhaust vent of the boiler." Fitz noted that the fiberboard roofing materials appeared to have ignited first, and that such materials could ignite at temperatures below 500 degrees Fahrenheit. Fitz observed,

4

"One installation defect that can cause sooting problems is the failure to install a low temperature bypass as shown in the manual."

¶9 Famous Dave's filed suit against Diamond, which in turn sought indemnification from several third-party defendants, including O'Mailia. Diamond alleged that O'Mailia "failed to follow the manufacturer's specifications, architectural specifications and the building codes and regulations in effect at the time the installation of the Lochinvar Water Heater occurred." Diamond further alleged it was entitled to indemnification from O'Mailia "for any amounts awarded to [Famous Dave's] as a consequence of the damages caused by the defective installation."

¶10 O'Mailia notified TIE of the suit by Diamond and asked TIE to provide a defense. TIE initially denied coverage, but after further correspondence, decided to defend the lawsuit under a reservation of rights. TIE then filed a petition for declaratory relief, asking the District Court to declare that O'Mailia's policy offered no coverage for claims arising from the fire at Famous Dave's. TIE argued that although the allegedly negligent installation occurred during the policy period, the resulting property damage occurred after the policy was terminated, and therefore was not covered by the policy.

¶11 In response, O'Mailia argued that property damage had occurred during the policy period because prior to the fire, wooden materials near the water heater had been degraded by pyrolysis. Accordingly, O'Mailia asked the District Court to declare that his TIE policy provided coverage for claims resulting from the Famous Dave's fire. O'Mailia also filed counterclaims alleging unfair claim settlement practices, breach of the insurance contract, breach of the covenant of good faith and fair dealing, common law

5

insurance bad faith, negligent infliction of emotional distress, and negligence. O'Mailia also sought punitive damages.

¶12 TIE moved for summary judgment on all claims, arguing there was no coverage under the policy as a matter of law. O'Mailia filed a cross-motion for summary judgment, claiming that expert reports and testimony established that the wooden materials surrounding the water heater were damaged by high temperatures during the policy period, and therefore, there was coverage under the policy. The District Court granted summary judgment in favor of TIE, characterizing pyrolysis not as property damage, but as a condition that increased the risk of property damage. The District Court thus concluded no property damage occurred during the policy period, and there was no coverage under the policy. The District Court then dismissed O'Mailia's counterclaims with prejudice. O'Mailia filed this appeal.

## STANDARD OF REVIEW

¶13 We review a district court's ruling on summary judgment de novo, applying the same M. R. Civ. P. 56 criteria as the district court. *State Farm Mut. Auto. Ins. Co. v. Freyer*, 2010 MT 191, ¶ 6, 357 Mont. 329, 239 P.3d 143; *United Natl. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 2009 MT 269, ¶ 11, 352 Mont. 105, 214 P.3d 1260. Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3); *United Natl. Ins. Co.*, ¶ 11. The interpretation of an insurance contract is a question of law, which we also review de novo. *United Natl. Ins. Co.*, ¶ 12.

## DISCUSSION

¶14   *1. Whether the District Court erred when it granted summary judgment in favor of TIE on the basis that no property damage occurred during the policy period.*

¶15   O'Mailia's TIE policy applies "[t]o 'bodily injury' and 'property damage' only if . . . the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and . . . [t]he 'bodily injury' or 'property damage' occurs during the policy period."  The policy provides the following definition of an "occurrence":

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in "bodily injury" or "property damage" that first occurs during the policy period . . . .  "Bodily injury" and "property damage" first occurs during the policy period only if . . . [t]he "bodily injury" or "property damage" is first sustained by a person or entity during the policy period as the direct result of an accident that first occurs during the policy period . . . .

"Property damage" is defined by the policy as "[p]hysical injury to tangible property, including all resulting loss of use of that property which first occurs during the policy period," or "[l]oss of use of tangible property that is not physically injured provided such loss of use is caused by an 'occurrence' that first takes place during the policy period."

¶16   O'Mailia claims that wooden materials surrounding the water heater were exposed to excessively high temperatures during the policy period, constituting "continuous or repeated exposure to substantially the same general harmful conditions," thus falling within the policy definition of an "occurrence."  Even if continuous harmful conditions exist during the policy period, however, those conditions must also lead to "property

7

damage" that is sustained during the policy period. For property damage to occur, there must be physical injury to or loss of use of tangible property.

¶17 While the policy defines "occurrence" and "property damage," it does not define the term "physical injury." Montana law has defined "physical injury" to property as "a physical and material alteration resulting in a detriment." *Swank Enters. v. All Purpose Servs., Ltd.*, 2007 MT 57, ¶ 18, 336 Mont. 197, 154 P.3d 52. Accordingly, we have held that application of improper paint to a water treatment center's pipes constituted physical injury because the paint physically and materially altered the pipes, causing a detriment when the pipes later had to be stripped and repainted. *Swank*, ¶ 19. The salting of core samples from a placer claim with gold was also considered physical injury because the samples were physically and materially altered by the addition of gold, which caused a detriment to claim owners who improperly relied on the core sampling results. *Lindsay Drilling & Contracting v. U.S. Fid. & Guar. Co.*, 208 Mont. 91, 96, 676 P.2d 203, 206 (1984). In both cases, the alteration was tangible and led directly to a detriment.

¶18 Our definition of physical injury was favorably compared to those of several other jurisdictions by the United States District Court for the District of Vermont. *Fine Paints of Eur., Inc. v. Acadia Ins. Co.*, No. 2:08-cv-81, 2009 U.S. Dist. LEXIS 24188, at *11 (D. Vt. Mar. 24, 2009). In that case, the court applied a "commonsense construction" and determined that physical injury to property occurs "when the property is altered in appearance, shape, color or in other material dimension." *Fine Paints of Eur., Inc.*, 2009 U.S. Dist. LEXIS 24188, at *12 (citing *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 496 (Ill. 2001); *Webster v. Acadia Ins. Co.*, 934 A.2d 567, 571 (N.H. 2007); 9A

8

Steven Plitt et al., *Couch on Insurance* § 129:6 (3d ed. 1995)). This definition, while somewhat more specific, is consistent with our holdings in *Swank*, ¶ 19, and *Lindsay Drilling & Contracting*, 208 Mont. at 96, 676 P.2d at 206.

¶19 O'Mailia argues that pyrolysis occurring during the policy period caused physical injury by physically and materially altering the wooden materials surrounding the water heater. Those courts that have considered whether pyrolysis constitutes physical injury or property damage, however, appear to have rejected the argument. *Greenlee v. Sherman*, 142 A.D.2d 472, 477 (N.Y. App. Div. 1989); *Aetna Cas. & Sur. Co. v. Naran*, No. 05-96-01486-CV, 1999 Tex. App. LEXIS 843, at *14 (Feb. 10, 1999); *Indus. Risk Ins. v. West Bend Mut. Ins. Co.*, No. 90-1573, 1991 Wisc. App. LEXIS 644, at *6 (April 3, 1991).

¶20 Pyrolysis was described by Hagan as "primarily off-gassing" of wooden materials, and was distinguished from smoldering or combustion, both of which would clearly constitute a physical and material alteration. In contrast, none of the investigators, including Hagan, claimed that the structure surrounding the water heater would have been significantly damaged or rendered unusable merely as a result of exposure to high temperatures. Pyrolysis was not itself the detriment suffered in this case, in contrast to the physical injuries observed in *Swank*, ¶ 19, or *Lindsay Drilling & Contracting*, 208 Mont. at 96, 676 P.2d at 206. At most, pyrolysis created a condition that increased the probability of a later physical injury. As Hagan observed, "However, if the heat exchanger had been cleaned and the unit properly serviced, it would have stopped the pyrolization and exposure of the wood framing members to excessively high

9

temperatures that ultimately led to the fire." This is consistent with the conclusion in *Greenlee*, under identical factual circumstances, that "Had the heat source been removed at any time prior to the fire, no further injury to the wooden joist would have occurred, and there would have been no fire, despite the chemical decomposition of the wooden joist allegedly caused during the policy period." 142 A.D.2d at 478.

¶21 Further, the assumption that pyrolysis occurred during the policy period is itself speculative, and thus insufficient to avoid summary judgment. *See Saari v. Winter Sports*, 2003 MT 31, ¶ 7, 314 Mont. 212, 64 P.3d 1038. Hagan did not suggest a time frame during which exposure to high temperatures likely occurred, other than to say it may have been "a couple of days or longer" before the fire. The policy period ended over three months before the fire. None of the experts, including Hagan, concluded or even suggested that harmful exposure to high temperatures occurred during the policy period.

¶22 Consequently, there is no evidence that physical injury—and thus property damage—was sustained during the policy period. Even if exposure to excessively high temperatures created a generally harmful condition during the policy period, the existence of that condition did not result in property damage occurring during the policy period, and thus did not constitute an "occurrence" as defined by the policy. *See Frankenmuth Mut. Ins. Co. v. Eurich*, 394 N.W.2d 70, 72 (Mich. Ct. App. 1986) ("the occurrence was the date of the accident, not the date the negligent act was performed which gave rise to the subsequent accident."). O'Mailia's TIE policy is inapplicable to the present claims resulting from the Famous Dave's fire.

¶23    *2. Whether the District Court violated O'Mailia's right to due process when it dismissed his counterclaims with prejudice after granting summary judgment in favor of TIE.*

¶24    O'Mailia also argues that the District Court erred when, after granting TIE's motion for summary judgment, it dismissed O'Mailia's counterclaims with prejudice and without the opportunity to be heard. TIE moved for summary judgment on all claims, including O'Mailia's counterclaims. The District Court concluded, after receiving thorough briefing from both parties, that O'Mailia's TIE policy provided no coverage for claims resulting from the Famous Dave's fire and that TIE had no duty to defend. As a result of this conclusion, there was no basis for O'Mailia's allegations that TIE had breached its contract, acted in bad faith, or violated Montana law by denying coverage. The District Court did not err when it dismissed O'Mailia's counterclaims, all of which were dependent on whether the TIE policy was applicable to the underlying claims, a question O'Mailia was permitted to argue extensively.

¶25    Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE

11